HOUSE SPEAKER v GOVERNOR

MICHIGAN UNITED CONSERVATION CLUBS v GOVERNOR

MICHIGAN ENVIRONMENTAL PROTECTION FOUNDATION v
GOVERNOR

Docket Nos. 94631-94633. Argued May 6, 1993 (Calendar No. 6).
Decided September 2, 1993.

Following issuance by the Governor of two executive orders,
Executive Order No. 1991-31, essentially abolishing the existing
Department of Natural Resources and certain legislatively
established boards and commissions relating to the state's
natural resources and creating a new department, and Execu-
tive Order No. 1991-33, establishing the Michigan Environmen-
tal Science Board as an independent, autonomous entity within
the Department of Management and Budget, the Speaker of
the House of Representatives, the Michigan United Conserva-
tion Clubs, the Michigan Environmental Protection Founda-
tion, and others brought separate actions in the Ingham Circuit
Court challenging the Governor's authority. After consolida-
tion, the court, Peter D. Houk, J., enjoined enforcement of
Executive Order No. 1991-31, finding it violative of the Separa-
tion of Powers Clause and beyond the Governor's authority.
The Court of Appeals, WAHLS, P.J., and MARILYN J. KELLY, J.
(REILLY, J., concurring in part and dissenting in part), affirmed,
additionally finding that because Executive Order No. 1991-31
was unconstitutional, Executive Order No. 1991-33 could not be
implemented (Docket Nos. 148677-148679). The defendants ap-
peal, limited to the issues of the plaintiffs' standing, the exis-
tence of a political question, and the constitutionality of Execu-
tive Orders Nos. 1991-31 and 1991-33.

In a unanimous opinion by Justice BRICKLEY, the Supreme
Court held:

1. The not-for-profit corporate plaintiffs have standing to sue
under MCR 2.201(B)(4) and because their actions were brought
to prevent the expenditure of state funds by a group having no
lawful authority to make such expenditures, making unneces-
sary a finding regarding whether the legislator plaintiffs have
standing.

2. The issues presented are justiciable political questions, and
therefore the merits of the case may be reached.

3. Executive Order No. 1991-31 is the type of legislative

authority expressly granted to the Governor under Const 1963, art 5, § 2 to make changes in the organization of the executive branch or in the assignment of functions among executive branch units necessary for efficient administration, including enacting laws affecting the executive branch. Neither the separation of powers doctrine nor the Executive Organization Act can be interpreted to prevent the Governor from exercising his constitutionally mandated legislative powers. The Governor needs no legislative implementation to effect executive branch reorganization plans.

4. Because Executive Order No. 1991-31 is a constitutional expression of the Governor's authority, Executive Order No. 1992-19, which replaced Executive Order No. 1991-33, also is a legitimate exercise of gubernatorial authority and does not wrongfully delegate rule-making authority to the Environmental Science Board. Thus, the board is a proper advisory body.

Reversed.

195 Mich App 376; 491 NW2d 832 (1992) reversed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Susan I. Leffler,* Assistant Attorney General, and *Mary Kay Scullion,* Special Assistant Attorney General, for plaintiff House Speaker.

*Peter W. Steketee, Karen Kendrick-Hands,* and *Marcia M. McBrien,* for plaintiff Michigan Environmental Protection Foundation.

*M. Carol Bambery (Tom Downs,* of counsel), for plaintiff Michigan United Conservation Clubs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Thomas C. Nelson* and *Deborah Anne Devine,* Assistant Attorneys General, for the defendants.

Amici Curiae:

*Dykema, Gossett* (by *Richard D. McLellan,*

*William J. Perrone,* and *Sandra M. Cotter)* and *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Peter H. Ellsworth* and *William C. Bertrand, Jr.),* for Governor George Romney.

BRICKLEY, J. Almost three decades ago, the State of Michigan ratified a new constitution. The document was the culmination of months of work, through the 1961 Constitutional Convention, restructuring Michigan's government to make it more efficient and accountable. Perhaps the biggest need for restructuring was in the executive branch, which, before the new constitution, was composed of so many boards, commissions, and departments that the executive branch lacked any kind of effective coördination or supervision.[1] Indeed, the general consensus at the convention was that there was "absolutely no rhyme or reason to the structure of the state government." 2 Official Record, Constitutional Convention 1961, p 1836 (statement of Delegate Martin).

· To give the Governor, as its head, some real control over the executive branch, the convention delegates agreed that the executive branch had to be given some logical structure.[2] To provide such structure, the constitution included a provision

[1] Indeed, Delegate Bentley noted that "[t]he structure [of the executive branch] is incredibly and unnecessarily complex and, in terms of direct authority and administrative control, the governor is chief executive in name only." 2 Official Record, Constitutional Convention 1961, p 1837.

[2] As one convention delegate stated:

[R]eorganization is a must if the governor is to have a structure of government such that he can maintain contact with the heads of his principal departments in such a way as to not only know what is going on but to be able to give some supervision and direction to the functioning of state government. [2 Official Record, Constitutional Convention 1961, p 1836 (statement of Delegate Martin).]

mandating that all entities within the executive branch be allocated among and within not more than twenty principal departments.[3] The Legislature was given primary responsibility for this task, but, if it failed, the Governor was given authority to effect the allocation.[4] The Governor was also given authority to make changes after the initial organization.[5] The Governor serving at that time did not participate in the initial organization, however, because the Legislature, within its allotted time, enacted the Executive Organization Act (EOA), MCL 16.101 *et seq.*; MSA 3.29(1) *et seq.*, and

[3] Const 1963, art 5, § 2 provides in full:

All executive and administrative offices, agencies and instrumentalities of the executive branch of state government and their respective functions, powers and duties, except for the office of governor and lieutenant governor and the governing bodies of institutions of higher education provided for in this constitution, shall be allocated by law among and within not more than 20 principal departments. They shall be grouped as far as practicable according to major purposes.

Subsequent to the initial allocation, the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders and submitted to the legislature. Thereafter the legislature shall have 60 calendar days of a regular session, or a full regular session if of shorter duration, to disapprove each executive order. Unless disapproved in both houses by a resolution concurred in by a majority of the members elected to and serving in each house, each order shall become effective at a date thereafter to be designated by the governor.

[4] Section 12 of the Schedule and Temporary Provisions provided the mechanics for the executive branch organization:

The initial allocation of departments by law pursuant to Section 2 of Article V of this constitution, shall be completed within two years after the effective date of this constitution. If such allocation shall not have been completed within such period, the governor, within one year thereafter, by executive order, shall make the initial allocation. [Const 1963, sched § 12.]

[5] See, generally, the second paragraph of art 5, § 2.

provided the required organization of the executive branch.

This case requires us to determine the scope of authority given to the Governor to effect subsequent changes in the structure of the executive branch. Specifically, we are asked whether the Governor, through an executive order not disapproved by the Legislature, may constitutionally transfer the authority, powers, duties, functions, and responsibility of the legislatively created Department of Natural Resources to a new, gubernatorially created DNR. We are also asked whether this issue concerning the Governor's authority presents a nonjusticiable political question and whether the plaintiffs in the consolidated lawsuit have standing to raise these issues. Finally, we have been asked to determine the validity of Executive Order No. 1992-19 that created the Michigan Environmental Science Board.

For the reasons that follow, we hold that the not-for-profit corporate plaintiffs have standing to pursue this lawsuit and that the issues presented are not political questions. We then hold that, under Const 1963, art 5, § 2, the Governor has the authority to transfer all the authority, powers, duties, functions, and responsibilities of a legislatively created principal department to a gubernatorially created principal department. The constitutional validity of Executive Order No. 1991-31 therefore is sustained. Additionally, we sustain the validity of Executive Order No. 1992-19, which created the Michigan Environmental Science Board.

I

On November 8, 1991, Governor John Engler issued Executive Order No. 1991-31, which essentially abolished the existing DNR and created a

"new" department.[6] The head of the "new" DNR continued to be the Commission of Natural Resources, but the order gave the Governor exclusive authority to appoint the commission chairperson, who served in that position at the Governor's will.[7] Additionally, the order abolished eighteen legislatively established boards and commissions relating to the state's natural resources and vested their authority in the director of the gubernatorially created "new" DNR.[8]

Also on that date, Governor Engler issued Executive Order No. 1991-33, which established the Michigan Environmental Science Board as an independent, autonomous entity within the Department of Management and Budget. The board's general duties included advising the Governor, the commission, the DNR, and other state agencies about issues affecting the state's natural resources, assisting the Governor in reviewing state or federal environmental impact statements and coördinating reviews of other state agencies, reviewing the establishment of new standards for permits or operating licenses, reviewing the methodology for establishing permit or operating license conditions,

[6] Executive Order No. 1991-31(I)(A)(1) provides in pertinent part:

All the statutory authority, powers, duties, functions and responsibilities of the Commission of Natural Resources and of the Department of Natural Resources . . . and of the director of the Department of Natural Resources and of the agencies, boards and commissions contained therein, . . . are hereby transferred to the director of a new Michigan Department of Natural Resources . . . .

[7] Before the order, the commission chairperson was elected by the members of the commission and served at its will.

[8] The DNR director, as before, was appointed by the commission and served at its pleasure. Executive Order No. 1991-31(I)(A)(1)(b). The order further provided that all permit-granting and rule-making authority was transferred to the director of the "new" DNR. *Id.,* § (I)(A)(2). The director also was given authority to delegate a duty or power conferred by the order or by applicable law. See *id.*

and reviewing staff recommendations for the approval or denial of permit and license applications. Executive Order No. 1991-33(3)(a)-(e). The board also was given authority to "make inquiries, studies and investigations, hold hearings and receive comments from the public." Executive Order No. 1991-33(6).

By its terms, Executive Order No. 1991-31 was to become effective sixty days after its issuance.[9] Before that date, the Speaker of the House of Representatives and other legislators filed a complaint, seeking declaratory and injunctive relief on the ground that the order exceeded the Governor's limited legislative authority under the constitution as implemented by the EOA.[10]

Similarly, complaints were filed by the Michigan United Conservation Clubs and the Michigan Environmental Protection Foundation, alleging that the Governor overstepped his authority in issuing Executive Order No. 1991-31. Additionally, the MEPF alleged that Executive Order No. 1991-33 was unconstitutional and unlawful because it usurped and intruded upon the rights of the people to an open, accessible, and accountable government. The board, the MEPF alleged, would enable the DNR director to make environmental and resource management decisions in the privacy of his

---

[9] See n 3 for the procedures necessary for an executive order to have the force of the law.

[10] Specifically, the complaint challenged five different aspects of the order as being violative of the Governor's limited legislative powers. The plaintiffs challenged the Governor's authority to 1) abolish the DNR and create a new DNR within the executive branch, 2) designate the director of the new DNR and to administer and supervise the functions transferred to the new DNR, 3) transfer the authority to appoint the chairperson of the commission from the commission to the Governor, 4) create a new power in the director to delegate certain decision-making authority to his subordinates, and 5) create a new level of adjudication for persons aggrieved by the director's permit or operating license decisions.

office, without being guided by the principles of the public interest and relevant statutes.

By stipulation of the parties, the circuit court consolidated the three complaints. On competing motions for summary disposition, the court ruled almost completely in favor of the plaintiffs and permanently enjoined the Governor from enforcing Executive Order No. 1991-31. Initially, the court ruled that all the plaintiffs had standing to bring their lawsuits. It found beyond challenge the notion that the House Speaker and other legislators have a substantial interest in the orderly administration of government, the funding of principal departments, the administrative checks upon disbursing those funds, and the possible usurpation of legislative power by the executive branch. Furthermore, the court found that the MUCC and the MEPF had standing pursuant to the court rule that allows a "domestic nonprofit corporation organized for civic, protective, or improvement purposes" to bring an action to prevent the illegal expenditure of state funds. See MCR 2.201(B)(4)(a).

In discussing the Governor's authority to issue Executive Order No. 1991-31, the circuit court noted that the Separation of Powers Clause specifically prohibits one branch of government from exercising powers belonging to another branch unless such an exercise is expressly provided in the constitution. See Const 1963, art 3, § 2. The court found that, while the Governor argued that art 5, § 2 provided the authority for Executive Order No. 1991-31, that provision does not expressly authorize the Governor to create new departments. Therefore, the court found, the Governor had no express authority to exercise the powers that ordinarily belong to the Legislature. As a result, the court concluded, Executive Order No. 1991-31 violated the Separation of Powers Clause.

Moreover, the court pointed out that art 4, § 52 referring to the powers of the Legislature, lists the conservation and promotion of the state's natural resources as a "paramount public concern" within the Legislature's responsibilities to protect. This reference, the court asserted, provided further evidence to support the conclusion that Executive Order No. 1991-31 was beyond the Governor's authority.

Finally, the court noted that because art 5, § 2 is not self-executing, it is limited by the bounds of the EOA limiting transfers of departments, boards, commissions, and functions to other "principal department(s) established by this act." See MCL 16.103(d); MSA 3.29(3)(d). The court was convinced that nothing in the EOA could possibly suggest that the Governor had the authority to abolish an existing department and create a completely new one.

The circuit court concluded that Executive Order No. 1991-31 violated the Separation of Powers Clause and was authorized neither by the state constitution nor the EOA.[11] Apparently, however, the court did not discuss the viability of Executive Order No. 1991-33.[12]

The Court of Appeals affirmed in a divided opinion. 195 Mich App 376; 491 NW2d 832 (1992).

[11] The court also found that 1) transfers of departments, boards, commissions, or agencies must be supervised by the principal department heads; 2) the Governor may not designate the chairperson of the commission; 3) the Governor may not delegate power to persons not authorized by statute to exercise it; 4) the Governor may not create new levels of adjudicatory hearings; 5) the Governor may not abolish commissions whose function is to hold public hearings; and, 6) the order did not constitute a violation of either the Open Meetings Act, MCL 15.261; MSA 4.1800(11), the Freedom of Information Act, MCL 15.231; MSA 4.1801(1), the Revised Judicature Act, MCL 600.101; MSA 27A.101, or substantive due process. The trial court also refused to award attorney fees and costs because the case involved a public question.

[12] See 195 Mich App 376, 392; 491 NW2d 832 (1992).

For the same reasons espoused by the trial court, the Court of Appeals held that all the plaintiffs had standing. *Id.* at 381-383. The Court also agreed with the trial court that, by issuing Executive Order No. 1991-31, the Governor violated the separation of powers doctrine and exceeded his constitutional authority because no provision expressly authorized him to create a new principal department. *Id.* at 385-389. In making such a ruling, the Court distinguished the case at bench from our decision in *Soap & Detergent Ass'n v Natural Resources Comm,* 415 Mich 728; 330 NW2d 346 (1982), in which we upheld a gubernatorial transfer of the Water Resources Commission's rulemaking power to the DNR. 195 Mich App 388. *Soap & Detergent* was distinguishable, the Court found, because the Governor was merely transferring functions and, here, the Governor eliminated whole functions and created an entirely new DNR. Such activity, the Court continued, clearly disregards the limited nature of the executive branch's legislative authority recognized in *Soap & Detergent.* 195 Mich App 388, citing *Soap & Detergent,* 415 Mich 752. Essentially, the Court of Appeals agreed with the results and reasoning of all the trial court rulings.[13]

The Court of Appeals also addressed two issues the trial court did not really confront.[14] First, the Court rejected the defendants' argument that the

[13] As did the trial court, the Court of Appeals also held that 1) the Governor may not abolish the function of commissions to hold public hearings, 2) transfers must be supervised by the principal department heads, 3) the Governor has no authority to appoint the chair of the commission, and 4) attorney fees and costs were properly denied because of the involvement of a public question. The defendants did not raise on appeal, and the Court of Appeals did not discuss, whether the Governor may delegate power to persons not statutorily authorized to exercise it or whether the Governor may create new levels of adjudicatory hearings.

[14] Additionally, the Court ruled that the Governor was not immune from suit because legislators do not have governmental immunity

plaintiffs' issues raised nonjusticiable political questions. 195 Mich App 383-384. The defendants had argued that the doctrine of equitable discretion should be applied because the legislative plaintiffs could obtain substantial relief from fellow legislators through the enactment, repeal, or amendment of a statute. *Id.* at 383. However, the Court found that the plaintiffs could not obtain substantial relief because, even if the Legislature rejected, overturned, or reduced the effectiveness of Executive Orders Nos. 1991-31 and 1991-33, there was nothing to prevent the Governor from attempting another executive reorganization. *Id.* at 384. Moreover, the Court found, the question presented, whether the Governor exceeded his authority to exercise limited legislative powers, was a matter of constitutional interpretation and, as such, was a proper matter for the Court's consideration because it was the ultimate interpreter of the constitution. *Id.*

Second, the Court considered the validity of Executive Order No. 1991-33. The Court noted that part of the board's duties included reporting its findings to the "new DNR" and advising it on issues affecting the management of the state's natural resources. See, generally, Executive Order No. 1991-33(3). Having found Executive Order No. 1991-31 unconstitutional, the Court noted that there was no "new DNR" to which the board could report or advise. As a result, the Court concluded that Executive Order No. 1991-33 contemplated and assumed the implementation of Executive Order No. 1991-31 and, having found Executive Order No. 1991-31 to be unconstitutional, it ruled that Executive Order No. 1991-33 could not be implemented.

when acting outside their "sphere" of authority and because when, as in this case, the relief sought is equitable in nature, the doctrine of governmental immunity does not apply. 195 Mich App 384-385.

Judge REILLY dissented from that portion of the Court of Appeals holding that the Governor exceeded his constitutional authority in issuing Executive Order No. 1991-31. 195 Mich App 396. She argued that there was no basis for the majority's position that provisions of the EOA could limit the Governor's authority under art 5, § 2. She asserted that this Court in *Soap & Detergent, supra,* did not hold that the Governor's legislative power to reorganize the executive branch could be limited or denied by an act of the Legislature. *Id.* at 400. On the contrary, notwithstanding the separation of powers doctrine, the Governor was given broad concurrent legislative power in the limited area of organizing and reorganizing the executive branch. *Id.* at 401-402. The Legislature's remedy, if it disapproved of the executive proposal, was to exercise its veto powers. *Id.* at 402.

Judge REILLY also disagreed with the majority's decision that Executive Order No. 1991-33 could not be implemented. *Id.* at 415-416. She noted that the language of Executive Order No. 1991-33 made it clear that the board's role was strictly advisory in nature. *Id.* The board was only authorized to make findings and recommendations to the DNR director. *Id.* at 416. As a result, the Governor had not delegated decision-making powers to the board because, notwithstanding the advice and recommendations from the board, only the DNR director had final decision-making authority. *Id.*

This Court granted defendants' motion for leave to appeal on January 6, 1993. The order limited the issues on appeal to the plaintiffs' standing, the existence of a political question, and the constitutionality of Executive Order No. 1991-31. The MEPF's cross appeal was limited to the issue of the constitutionality of Executive Order No. 1991-33.

II

The concept of standing represents a party's interest in the outcome of litigation that ensures sincere and vigorous advocacy.[15] However, a commitment to vigorous advocacy alone is not enough. Rather, "[s]tanding requires a demonstration that the plaintiff's substantial interest will be detrimentally affected in a manner different from the citizenry at large." *House Speaker v State Administrative Bd,* 441 Mich 547, 554; 495 NW2d 539 (1993).

Both the trial court and the Court of Appeals found that the MUCC and MEPF had standing to sue under MCR 2.201(B)(4). We agree. The court rule allows a domestic nonprofit corporation organized for civic, protective, or improvement purposes to bring an action to prevent the illegal expenditure of state funds.[16] The MEPF is a nonprofit Michigan corporation whose purposes are to evaluate legal issues and bring environmental litigation on issues

---

[15] See *Flast v Cohen,* 392 US 83, 99-100; 88 S Ct 1942; 20 L Ed 2d 947 (1958) ("when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue"); *Baker v Carr,* 369 US 186, 204; 82 S Ct 691; 7 L Ed 2d 663 (1962) (to confer standing, the plaintiff must allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions").

[16] MCR 2.201(B)(4) provides in full:

An action to prevent illegal expenditure of state funds or to test the constitutionality of a statute relating to such an expenditure may be brought:
   (a) in the name of a domestic nonprofit corporation organized for civic, protective, or improvement purposes; or
   (b) in the names of at least 5 residents of Michigan who own property assessed for direct taxation by the county where they reside.

of statewide importance. The MUCC is a nonprofit Michigan corporation whose purposes are to further the cause of the environment and conservation in all its phases, to promote and encourage the intelligent use of resources, to promote conservation education programs, and to protect and defend the rights of citizens to keep and bear arms. We find that these corporations are organized for civic, protective, or improvement purposes and, as such, are the type of plaintiff the court rule envisioned.

Moreover, it fairly can be said that this lawsuit was brought to prevent the illegal expenditure of state funds. For purposes of determining standing, we must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v Seldin,* 422 US 490, 501; 95 S Ct 2197; 45 L Ed 2d 343 (1975). Therefore, for this limited purpose, we assume that the Governor had no authority to create a "new" DNR, and any money spent by such an agency would be done illegally. As a result, we find that the plaintiffs can be said to have brought this lawsuit to prevent the expenditure of state funds by a group having no lawful authority to make such expenditures. On this basis, plaintiffs MUCC and MEPF have standing.

Because we find that the MUCC and MEPF have standing to bring this lawsuit, we need not decide whether the remaining plaintiffs have legislator standing.[17] In view of the fact that the organizational standing allows us to decide all the issues raised by all the parties, our standing discussion need go no further.

---

[17] For a thorough discussion of legislative standing, see *House Speaker v State Administrative Bd,* 441 Mich 547, 556; 495 NW2d 539 (1993).

III

The political question doctrine requires analysis of three inquiries: "(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coördinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations [for maintaining respect between the three branches] counsel against judicial intervention?" *Goldwater v Carter,* 444 US 996, 998; 100 S Ct 533; 62 L Ed 2d 428 (1979) (Powell, J., concurring) (citing *Baker v Carr,* 369 US 186, 217; 82 S Ct 691; 7 L Ed 2d [1962]). The fact that this case involves "political" issues is not determinative of the need for this Court to defer to the Governor on political question grounds. Rather, as noted in *Baker,* "[t]he doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." 369 US 217.[18]

First, the language of the constitution alone cannot resolve the issues this case presents. The state constitution does not mention gubernatorial authority to completely abolish the existing DNR and create a new department, nor does it commit to one branch of government the power to determine the scope of such authority. We cannot, therefore, look at the language in isolation, but must apply the rules of constitutional construction to the express language. Second, resolution of this case would not require this Court to move beyond

[18] Similarly, the mere fact that a case involves a conflict between the legislative and executive branches "does not preclude judicial resolution of the conflict." *United States v AT&T,* 551 US App DC 198, 204; 551 F2d 384 (1976) (citing *Senate Select Comm on Presidential Campaign Activities v Nixon,* 162 US App DC 183; 498 F2d 725 (1974).

its areas of expertise. On the contrary, "[d]eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." *Baker,* 369 US 211. Of course, this statement is true not only for the branches of the federal government, but for the branches of Michigan's state government as well.[19] Determining whether the state constitution impliedly authorizes the Governor to abolish the DNR and create a new department may not be easy, "but it only requires us to apply normal principles of interpretation to the constitutional provisions at issue." See *Goldwater,* 444 US 999 (Powell, J., concurring).

Finally, there are no prudential considerations that keep us from resolving the issues this case presents. Interpreting the constitution does not imply a lack of respect for another branch of government, even when that interpretation differs from that of the other branch. *Id.* Where it is otherwise proper, virtually no court, including this Court, is hesitant to render its interpretation of a constitutional or statutory provision, even though another branch of government has already issued a contrary interpretation. See, e.g., *United States v Nixon,* 418 US 683; 94 S Ct 3090; 41 L Ed 2d 1039 (1974); *Senate Select Comm on Presidential Cam-*

[19] See *Richardson v Secretary of State,* 381 Mich 304, 309; 160 NW2d 883 (1968) ("Interpretation of the State Constitution is the exclusive function of the judicial branch. Construction of the Constitution is the province of the courts and this Court's construction of a State constitutional provision is binding on *all* departments of government.") (emphasis added). See also *Regents of the Univ of Michigan v Employment Relations Comm,* 389 Mich 96, 103; 204 NW2d 218 (1973) ("A conflict between the constitution and the statute is clearly a legal question which only a court can decide").

*paign Activities v Nixon,* 162 US App DC 183; 498 F2d 725 (1974); *Soap & Detergent, supra.* On the basis of our analysis of these inquiries, we are convinced that the issues presented in this case are justiciable political questions. Moreover, because our authority to reach the merits of this case is not based on the standing of the legislator plaintiffs, we find it unnecessary to discuss the doctrine of equitable discretion.[20] There is, therefore, nothing to preclude us from reaching the merits of this case.

IV

The plaintiffs argue that Executive Order No. 1991-31 goes beyond the limited grant of authority from art 5, § 2 and represents an unconstitutional usurpation of legislative powers. On the contrary, on the basis of the rules of constitutional construction, we find that Executive Order No. 1991-31

[20] The doctrine of equitable discretion, as explained by Judge Robb of the United States Court of Appeals for the District of Columbia Circuit, provides "[w]here a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute, this court should exercise its equitable discretion to dismiss the legislator's action." *Riegle v Federal Open Market Committee,* 211 US App DC 284, 292; 656 F2d 873 (1981), cert den 454 US 1082 (1981). Judge Robb intimated the very limited nature of this doctrine because he noted that it would be used by courts "to refrain from hearing cases which represent the most obvious intrusion by the judiciary into the legislative arena: challenges concerning congressional action or inaction regarding legislation." *Id.* See also *Dornan v Secretary of Defense,* 271 US App DC 195; 851 F2d 450 (1988) (the court refused to acknowledge legislator standing because a remedy existed within the legislature). Notwithstanding the absence of a legislator plaintiff, the doctrine is inapplicable here because this case involves an allegedly unconstitutional gubernatorial action in violation of the separation of powers doctrine. As we found in *State Administrative Bd, supra,* that this is the very kind of conflict that this Court ought to resolve.

Our refusal to apply the doctrine to this case, however, is not meant to confer, one way or the other, our opinion regarding its possible applicability in a future case. See *State Administrative Bd,* 441 Mich 561, n 25.

represents the type of legislative authority expressly given to the Governor. Moreover, neither the separation of powers doctrine nor the EOA can be interpreted to prevent the Governor from exercising his constitutionally mandated legislative powers.

### A

There are two very important rules that must be considered when construing constitutional provisions. The first rule requires that the interpretation given the provision be " 'the sense most obvious to the common understanding' "; the one that " 'reasonable minds, the great mass of people themselves, would give it.' " *Soap & Detergent,* 415 Mich 745, quoting *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971); *Council No 11, AFSCME v Civil Service Comm,* 408 Mich 385, 405; 292 NW2d 442 (1980). The provision relevant here, the second paragraph of art 5, § 2, clearly provides: "the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration." As Judge REILLY pointed out in dissent in the Court of Appeals, this provision is clear and unambiguous. The Governor has been given express authority to effect something as limited as a transfer of functions among executive branch entities or as broad as alterations in the very structure of the executive branch. Assuming additional requirements are met, such changes may be made even if they involve changes in the law.[21] The only constitutional limitation placed on the Governor is that the change cannot have the

---

[21] See n 3 for the procedures necessary for an executive order requiring the force of law.

effect of exceeding the limit of twenty departments within the executive branch.[22]

We find that the types of changes the Governor made in Executive Order No. 1991-31 are the types contemplated by the clear language of art 5, § 2. By transferring all the authority, powers, duties, functions, and responsibilities of the DNR into a new DNR, the Governor made a change in the organization of the executive branch. Granted, the change is a significant one, but a constitutional change nonetheless. Executive Order No. 1991-31 represents changes in the manner in which the executive branch handles a vast array of natural resource concerns. We conclude that interpreting Executive Order No. 1991-31 as a "change[ ] in the organization of the executive branch" gives the meaning to art 5, § 2 that is most consistent with the "common understanding" of the provision and is the interpretation that "reasonable minds, the great mass of people themselves, would give it."

The plaintiffs concede that had the Legislature not initially allocated the executive branch into the twenty constitutionally mandated departments the Governor would have had the authority to do so under § 12 of the Schedule and Temporary Provisions.[23] The plaintiffs acknowledge that the Governor's authority in this respect was coequal with that of the Legislature. Because the Legislature acted within its allocated time, however, the plaintiffs contend that the Governor's legislative authority was significantly diminished. On the contrary, the very language of art 5, § 2 enables the Governor to enact laws affecting the executive branch, just as the Legislature can. Article 5, § 2 provides that "[s]ubsequent to the initial allocation . . . [w]here [the Governor's] changes

---

[22] See the text of art 5, § 2, quoted in n 3.

[23] See the text of Const 1963, sched § 12, quoted in n 4.

[in the organization of the executive branch or in the assignment of functions among its units] require *the force of law,* they shall be set forth in *executive orders* and submitted to the legislature." (Emphasis added.) The constitution, then, specifically recognizes that, where the Governor feels compelled to make certain changes within the executive branch, he has authority, through the executive order procedure, in effect, to enact laws to carry out those changes. The only way to preclude such changes is through a properly supported legislative veto.[24] In other words, after the initial executive branch organization, the Governor's reorganization powers are equal to the Legislature's initial and subsequent reorganization powers.

The various plaintiffs would also have us believe that the types of changes the constitution envisioned are limited to changes like the ones made in *Soap & Detergent, supra.* In that case, we found that the Governor, by executive order, had the authority to transfer the Water Resources Commission's rule-making authority to the NRC. 415 Mich 765. This represents, however, only a change "in the assignment of functions among its units . . . ." To say that *Soap & Detergent* is an example of the only type of authority the Governor has to effectuate changes in the executive branch is to completely ignore the remaining part of art 5, § 2, which allows the Governor to make changes "in the organization of the executive branch . . . ." Such an interpretation would violate the constitutional construction rule that requires that a provision be interpreted to give reasonable effect to all, not just some, of its parts. *Alan v Wayne Co,* 388 Mich 210, 277; 200 NW2d

---

[24] See n 3 for the full text of art 5, § 2.

628 (1972), citing *People v Mahaney,* 13 Mich 481 (1865).

The plaintiffs also argue that the constitution clearly and unambiguously vested in the Legislature the authority to preserve and protect the state's natural resources.[25] While this argument is true, it is also true, as Judge REILLY pointed out, that "[t]he language does not state that the organization and administration of an executive agency, having the responsibility for effectuating legislation protecting our natural resources, is placed under the *sole* control of the Legislature." 195 Mich App 407 (emphasis added). The importance of protecting the state's natural resources does not mean that such protection should be dominated by one branch of government rather than another. Because we find that the common understanding of art 5, § 2, encompasses the Governor's actions in Executive Order No. 1991-31, we also find that art 4, § 52 must be understood as not being a limitation on the Governor's concurrent legislative authority to reorganize the executive branch.

Our interpretation of art 5, § 2 is strengthened by the second important rule of constitutional construction, which requires consideration of " 'the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished . . . .' " *Soap & Detergent,* 415 Mich 745, quoting *Traverse City School Dist, supra,* 384 Mich 405. Of course, the most instructive tool for discerning the circumstances surrounding

---

[25] Article 4, § 52 provides in full:

The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.

the adoption of the provision is the floor debates in the Constitutional Convention record. However, we have noted previously that consideration of the debates is limited because "[t]hey are individual expressions of concepts as the speakers perceive them (or make an effort to explain them). Although they are sometimes illuminating, affording a sense of direction, they are not decisive as to the intent of the general convention (or of the people) in adopting the measures." *Regents of the Univ of Michigan v Michigan,* 395 Mich 52, 59-60; 235 NW2d 1 (1975). Nevertheless, we have said that they are particularly helpful "when we find in the debates a recurring thread of explanation binding together the whole of a constitutional concept." *Id.* at 60.

The Convention Record documents the extensive discussion among delegates of art 5, § 2, particularly that portion of the provision, the second paragraph, dealing with the Governor's authority to effect subsequent changes in the executive branch. The delegates generally agreed that there needed to be an executive reorganization procedure, but they did not agree about how easy it should be for the Legislature to disapprove a reorganization plan.[26] The discussion deals specifically with what was called the "Bentley amendment," which would have made it easier for the Legislature to reject an executive reorganization proposal.[27] In a general sense, the discussion recognized that, without the amendment, the Governor would have tremendous legislative authority to

[26] See, generally, 2 Official Record, Constitutional Convention 1961, p 1842 (statement of Delegate Bentley).

[27] As it was introduced (and as it was subsequently adopted), art 5, § 2 provided that, unless disapproved by a majority of *both* houses of the Legislature, a reorganization plan requiring the force of law and created by executive order became effective. Under the Bentley amendment, disapproval by *either* house of the Legislature would have been sufficient to defeat an executive reorganization plan.

enact changes in the executive branch.[28] The

[28] Indeed, many of the delegates opposed the Bentley amendment because they felt a need for a strong executive. Many felt a strong executive was needed to promote efficiency and economy in state government:

> *Mr. Binkowski:* [I]f you want a strong executive, if you want to place the responsibility upon him, this is the manner in which you do it, and therefore I speak against the amendment. [2 Official Record, Constitutional Convention 1961, p 1844.]

> *Mr. Pollock:* It seems to me, Mr. Chairman, that the problem is one of administrative organization and here, it seems to me, the governor is in a much better position to know what is needed within his own administrative structure than anybody else.
>
> \* \* \*
>
> [E]ither you want to promote flexibility in administrative structure, and thus to permit the abolition of useless agencies, the combining of others, or you want to make it so difficult that, in fact, it is not going to be accomplished. . . . [T]he experience of our legislature in the exercise of their veto over the governor's power gives nobody any encouragement that it will ever get anywhere if it remains as easy as that. . . . [2 Official Record, Constitutional Convention 1961, pp 1846-1847.]

> *Mr. Binkowski:* I think basically the reason for having this form is to place the responsibility with the executive, who should know all about these administrative agencies, and to allow him to initiate the programs, and therefore present them to the legislature. I think the reason for executive reorganization is simply economy and efficiency in government. [2 Official Record, Constitutional Convention 1961, p 1848.]

> *Mr. Durst:* I think that the majority report from the committee places enough power in the legislature to keep this thing from becoming an instrument of oppression, if you will, on the part of the governor, and yet gives to the governor the power which he needs to keep an efficient organization . . . . [2 Official Record, Constitutional Convention 1961, p 1848.]

> *Mr. Madar:* I can't see why you would want to take out of the hands of the executive branch the setting up of the administration of your government. Businessmen operate or try to operate a good businesslike administration. . . . I say this: for the sake of the people of the state of Michigan, give the administrative end the right to do this and if it isn't done properly by the governors, believe me, those people who elected them will also throw them out. Let's get good business administration in the state of Michigan. [2 Official Record, Constitutional Convention 1961, p 1851.]

amendment's proponents, then, recognized the amendment as a significant check upon that authority.[29] We find that the fact that the Bentley

Some of the delegates believed that a strong executive was needed to prevent political concerns from dictating the success of reorganization plans:

> *Mr. DeVries:* I think a more important reason for not getting administrative reorganization in the legislature is in the tendency to trade among legislative supporters for various agencies, and to prevent their favorite agencies from being consolidated or reorganized with others. And this always effectively blocks reorganization, particularly when it is easy to get a majority vote. . . . It seems to me if you try to depend on the legislature to accomplish rational administrative reorganization you are never going to get it done. [2 Official Record, Constitutional Convention 1961, p 1849.]

> *Mr. Martin:* [I]t is the most difficult thing in the world to get a plan for executive reorganization of a department through the legislature or approved because, as has been said, every agency has its protectors in that body, and the bigger the agency, the more protectors there are. Even the little agencies have protectors who will trade their votes for the votes of somebody else, so that you never get a satisfactory consideration of the merits of these questions. [2 Official Record, Constitutional Convention 1961, p 1852.]

[29] Many of the delegates who supported the Bentley amendment expressed their concerns over a Governor with broad reorganization authority:

> *Mr. Hutchinson:* I don't believe that we should overlook the tremendous political power which accompanies governmental reorganization . . . if, for instance, a particular function is being carried on in one department in a way which doesn't suit the governor and still he doesn't think it politically wise, you know, to remove the head of the department or anything, *he can, by a reorganization plan, simply take that function which is being performed in a manner not suitable to him out of that department and place it someplace else.* . . . Consequently, it is only a fair check and balance to permit either house of the legislature to veto it. [2 Official Record, Constitutional Convention 1961, p 1844. Emphasis added.]

> *Mr. Heideman:* [T]he origin and growth of constitutional government of free society has coincided with the origin and growth of legislative bodies and, of course, to an extent, the courts; not the executive. And the converse, of course, has been true in our time, that the ending of free societies has been by

amendment was subsequently defeated[30] evidences

the increasing and over extending of executive powers. [2 Official Record, Constitutional Convention 1961, p 1846.]

*Mr. Hutchinson:* [T]his is a tremendous political power, this power to reorganize. And I am not willing to agree, offhand, that just because the governor thinks that a particular reorganization is in the best interests of the government, that that necessarily makes it so. I think that the governor also can make some mistakes or be misled, or be influenced by groups or be influenced by considerations, which, in the minds of other people, might not be in the best interests of the state. [2 Official Record, Constitutional Convention 1961, p 1847.]

*Mr. Wanger:* [U]nder the proposal as set forth in the committee report, if the governor or his party have strong control of either house, or perhaps just some of the committees thereof, he could ram through a politically motivated reorganization. [2 Official Record, Constitutional Convention 1961, p 1848.]

*Mr. Hutchinson:* I want to, as best I can, convey to the delegates here the seriousness of vesting in a single man, who is the head of a political party, this tremendous political power to completely reorganize his executive branch of government to suit his political purposes. I am not here to say that that would customarily happen, but I can envision that it might. It was such kinds of concentration of political power in the hands of people overseas in Europe which completely destroyed liberty. I don't think that the people of Michigan would let it go that far, knowingly, but I would hate to see you write into our state constitution a system where constitutionally such strange things could be brought about under the guise of governmental reorganization. [2 Official Record, Constitutional Convention 1961, pp 1849-1850.]

*Mr. Shanahan:* Today, in Michigan, we apparently are having a movement for strengthening the executive, and that makes me very uncomfortable, because you get an all powerful executive, whether it is a king or an emperor or just a plain dictator, you have a dictatorship. It is the complete subjugation of democracy. On the other hand, when the legislative gets all powerful—we have examples in the world of that—democracy is not destroyed, it is preserved. . . . I cannot vote for anything that would be voting against democracy, against the opportunity of the people to express themselves, and they can express themselves much more readily through the legislature than they can through the governor. [2 Official Record, Constitutional Convention 1961, p 1850.]

[30] See, generally, 2 Official Record, Constitutional Convention 1961, p 1852 (statements of Chairman Millard and Secretary Chase).

the convention's recognition, as well as that of the general population that ratified the constitution without the amendment, that art 5, § 2 was intended to and did in fact bestow upon the Governor considerable authority to reorganize the executive branch.[31] The Convention Record, therefore, is a recurring thread of explanation that strengthens our conclusion that art 5, § 2 encompasses the types of changes the Governor made in Executive Order No. 1991-31.

A third rule of constitutional construction requires us, if possible, to avoid an interpretation that creates a constitutional invalidity. *Council No 11, supra,* 408 Mich 405; *Traverse City School Dist, supra,* 384 Mich 406, citing *Marbury v Madison,* 5 US (1 Cranch) 137, 175; 2 L Ed 60 (1803) ("If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction"). If we interpret art 5, § 2 to prohibit the Governor from effecting a reorganization plan involving more than merely transferring functions between units, we would invalidate that part of the second paragraph that allows him to "make changes in the organization of the executive branch." On the contrary, an interpretation that allows the Governor to make such changes avoids constitutional invalidity and is consistent with other rules of constitutional construction.

---

[31] This is not to suggest that the Governor has absolute authority to effect a reorganization plan. After the delegates defeated the Bentley amendment, they considered another minority amendment that would have required legislative defeat of an executive plan to be by a two-thirds majority of the members of each house. See, generally, 2 Official Record, Constitutional Convention 1961, p 1852 (statement of Secretary Chase). The committee, which proposed that the veto be only by a simple majority of each house, opposed this amendment because it made the Governor far too strong and made it virtually impossible for the Legislature to defeat a proposed plan. *Id.* at 1852-1853 (statements of Mr. Martin and Mr. Sterrett). This amendment was ultimately defeated, and a balance between executive authority to effect a reorganization plan and legislative authority to veto such a plan was maintained.

B

The plaintiffs argue that, by enacting Executive Order No. 1991-31, the Governor has violated the separation of powers doctrine, as articulated in art 3, § 2. They argue that the Governor has attempted to exercise powers that were given by the constitution exclusively to the Legislature. We find this argument to be without merit.

Const 1963, art 3, § 2 provides: "[T]he powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch *except as expressly provided in this constitution.*" (Emphasis added.)[32] Having already decided that art 5, § 2 gives the Governor authority to make the types of changes made in Executive Order No. 1991-31, we find that this provision allows the Governor to come within the exception emphasized above. See *Soap & Detergent,* 415 Mich 752 ("where, as in art 5, § 2, the constitution explicitly grants powers of one branch to another, there can be no separation of powers problem").

We are simply unpersuaded that allowing the Governor to make the kinds of changes contemplated in Executive Order No. 1991-31 violates the

[32] The separation of powers doctrine has never been interpreted to mean that the three branches of government

"must be kept wholly and entirely separate and distinct, and have no common link or dependence, the one upon the other, in the slightest degree. The true meaning is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free Constitution." [*Local 321, State, Co & Municipal Workers of America v Dearborn,* 311 Mich 674, 677; 19 NW2d 140 (1945), quoting Story, Constitutional Law (4th ed), pp 380 ff.]

separation of powers doctrine.[33] Rather, we find that art 5, § 2 authorizes the Governor to make relatively broad changes, as long as those changes are made within the executive branch.

C

As a final matter, there seems to be some confusion between the parties and in the courts below regarding whether art 5, § 2 is self-executing or whether it requires some sort of legislative implementation. Plaintiffs and the lower courts rely primarily on this Court's decision in *McDonald v Schnipke,* 380 Mich 14; 155 NW2d 169 (1968), for their assertion that art 5, § 2 is not self-executing.

---

[33] Our conclusion that Executive Order No. 1991-31 does not violate the separation of powers doctrine is buttressed by our observation that several other constitutional provisions vest powers in one branch of government that typically belong to another branch.

- Article 4, § 6 gives to the *Governor* the *legislative* veto power to disapprove bills.
- Article 11, § 5 gives the Civil Service Commission (an entity of the *executive* branch) the *legislative* power to establish pay rates and regulate conditions of employment in the classified service.
- Article 5, § 20 gives the *Governor* the *legislative* power to initiate reductions in appropriations.
- Article 5, § 14 gives the *Governor* the *judicial* power to grant reprieves, commutations, and pardons.
- Article 4, § 37 gives a joint committee of the *Legislature* the *executive* authority to suspend administrative rules when the Legislature is not in session.
- Article 5, § 6 gives the *Senate* the *executive* power to disapprove civil appointments of the Governor.
- Article 4, § 53 gives the *Legislature* the *executive* power to audit the financial transactions of executive branch agencies.
- Article 11, § 7 gives the *Legislature* the *judicial* power to impeach civil officers.
- Article 6, § 28 gives the *judiciary* the *executive* power to review decisions of administrative officers and agencies.
- Article 3, § 8 gives the *Supreme Court* the *legislative* power to issue advisory opinions on the constitutionality of legislative enactments in the absence of an actual case or controversy.

This assertion is only partially correct. All of the significant discussion of art 5, § 2 in *McDonald* related to the first paragraph, that is, the Legislature's initial organization of the executive branch into twenty departments. It must be assumed, therefore, that the Court's conclusion that art 5, § 2 is not self-executing related only to the Legislature's initial organization. Significantly, we did not find that the EOA applied to the second paragraph of art 5, § 2, relating to subsequent gubernatorial reorganizations.

Plaintiffs also argue that in *Soap & Detergent, supra,* we reaffirmed the implication that all of art 5, § 2 requires legislative implementation. Admittedly, because that case dealt with subsequent gubernatorial changes, our statement that the *McDonald* Court held that art 5, § 2 required legislative implementation could extend the requirement to the second paragraph of art 5, § 2. However, our decision in *Soap & Detergent* did not intend such an extension. Such a conclusion is clear from our recognition that the Governor should, but need not, follow the EOA procedures when issuing a reorganization plan:

> The fair implication of [*McDonald*] is that the Governor, in exercising his powers, *should* use the transfer mechanism established in the Executive Organization Act, i.e., the provisions regarding Type I through Type III transfers and the relationship between the departments and the transferred agencies. [415 Mich 750. Emphasis added.]

In support of the conclusion that the Governor should utilize the EOA, we cited in *Soap & Detergent* several examples of reorganization plans in which the Governor utilized the EOA's different

types of transfers.[34] However, former Governor Romney's amicus curiae brief cites several examples of reorganization plans in which the Governor did not utilize the EOA's transfer mechanisms.[35] We

[34] The EOA provides three types of transfers available to carry out reorganization plans:

(a) Under this act, a type I transfer means the transferring intact of an existing department, board, commission or agency to a principal department by this act. When any board, commission, or other agency is transferred to a principal department under a type I transfer, that board, commission or agency shall be administered under the supervision of that principal department. Any board, commission or other agency granted a type I transfer shall exercise its prescribed statutory powers, duties and functions of rule-making, licensing and registration including the prescription of rules, rates, regulations and standards, and adjudication independently of the head of the department. Under a type I transfer all budgeting, procurement and related management functions of any transferred board, agency or commission shall be performed under the direction and supervision of the head of the principal department.

(b) Under this act, a type II transfer means transferring of an existing department, board, commission or agency to a principal department established by this act. Any department, board, commission or agency assigned to a type II transfer under this act shall have all its statutory authority, powers, duties and functions, records, personnel, property, unexpended balances of appropriations, allocations or other funds, including the functions of budgeting and procurement, transferred to that principal department.

(c) Under this act, a type III transfer means the abolishing of an existing department, board, commission, or agency and all its statutory authority, powers, duties, functions, records, personnel, property, unexpended balances of appropriations, allocations or other funds, are transferred to that principal department as specified under this act. [MCL 16.103; MSA 3.29(3).]

[35] Compare Executive Order No. 1971-1 (type II transfer of the Economic Opportunity Office from the Executive Office of the Governor to the Department of Labor), Executive Order No. 1971-2 (type II transfer of the Building Division of the Bureau of the Budget from the Executive Office of the Governor to the Department of Administration), and Executive Order No. 1972-2 (type II transfer of the Corporations Division and the Corporation Franchise Fee Division from the Department of Treasury to the Department of Commerce), with Executive Order No. 1984-3 (transfer of the Governor's Office for Job Training from the Executive Office of the Governor to the Department of Management and Budget), Executive Order No. 1986-4 (transfer of the Governor's Office for Job Training from Department

conclude that this Court has never held that the second paragraph of art 5, § 2, requires legislative implementation. While the Governor should utilize the transfer mechanisms of the EOA, and in the case of Executive Order No. 1991-31, he did, he is not bound to follow such procedures.

We believe that the constitution itself supports the conclusion that the *second* paragraph of art 5, § 2 *is* self-executing. The first paragraph, providing for the initial organization, provides that "[a]ll executive and administrative offices, agencies and instrumentalities of the executive branch of state government . . . shall be allocated *by law* among and within not more than 20 principal departments" (emphasis added). There is, however, no similar requirement for legislative implementation in paragraph 2. We must conclude, therefore, that the Governor needs no legislative implementation to effect his executive branch reorganization plans under art 5, § 2.[36] As we have previously stated,

of Management and Budget to the Department of Labor), and Executive Order No. 1974-4 (establishing the Michigan Environmental Review Board).

[36] The constitution as a whole supports this conclusion as well. The following is a nonexhaustive list of examples in which the drafters believed that legislative implementation was necessary to carry out constitutional provisions. In the face of so many examples, because there is no such statement in paragraph 2 of art 5, § 2, we find there is no constitutional intent to require legislative implementation for subsequent gubernatorial reorganization plans.

- A board of state canvassers of four members shall be *established by law.* [Const 1963, art 2, § 7. Emphasis added.]
- The militia shall be organized, equipped and disciplined *as provided by law.* [Const 1963, art 3, § 4. Emphasis added.]
- Temporary commissions or agencies for special purposes with a life of no more than two years may be *established by law* and need not be allocated within a principal department. [Const 1963, art 5, § 4. Emphasis added.]
- The governor shall issue writs of election to fill vacancies in the senate or house of representatives. Any such election shall be held in a manner *prescribed by law.* [Const 1963, art 5, § 13. Emphasis added.]

the Governor may, and maybe even should, follow the procedures outlined in the EOA, but he is not constitutionally bound to do so.[37]

In any event, even if all of art 5, § 2 was not

- The supreme court shall consist of seven justices elected at non-partisan elections *as provided by law* . . . . Nominations for justices of the supreme court shall be in the manner *prescribed by law*. [Const 1963, art 6, § 2. Emphasis added.]
- Any elected officer of a political subdivision may be removed from office in the manner and for the causes *provided by law*. [Const 1963, art 7, § 33. Emphasis added.]
- *The legislature shall provide by law* for the establishment and support of public libraries which shall be available to all residents of the state under regulations adopted by the governing bodies thereof. All fines assessed and collected in the several counties, townships and cities for any breach of the penal laws shall be exclusively applied to the support of such public libraries, and county law libraries *as provided by law*. [Const 1963, art 8, § 9. Emphasis added.]
- No money shall be paid out of the state treasury except in pursuance of appropriations *made by law*. [Const 1963, art 9, § 17. Emphasis added.]
- Procedures relating to escheats and to the custody and disposition of escheated property *shall be prescribed by law*. [Const 1963, art 10, § 4. Emphasis added.]
- No person having custody or control of public moneys shall be a member of the legislature, or be eligible to any office of trust or profit under this state, until he shall have made an accounting, *as provided by law,* of all sums for which he may be liable. [Const 1963, art 11, § 4. Emphasis added.]

[37] We find further support for this conclusion from the title of the EOA, which instructs us that it is:

An act to *organize* the executive and administrative agencies of state government; to *establish* principal departments and department heads; to *define* the powers and duties of the principal departments and their governing agents; to *allocate* executive and administrative powers, duties, functions, and services among the principal departments; *to provide for a method for the gradual implementation of the provisions of this act* and for the transfer of *existing* funds and appropriations of the principal departments herein created and established. [MCL 16.101 *et seq.*; MSA 3.29(1) *et seq.* Emphasis added.]

It appears clear that the act was designed to take the executive branch as it existed before the 1963 Constitution and conform it to the requirements of the new constitution. It appears equally clear that it was not designed to control subsequent gubernatorial reorganizations.

self-executing and the EOA was the necessary implementing legislation, it could not constitutionally be interpreted as limiting the Governor's authority under art 5, § 2. Once the constitution has granted specific authority to one branch of government, the Legislature cannot subsequently take it away. *Council No 11,* 408 Mich 408 ("Since that grant of power is from the Constitution, any executive, legislative or judicial attempt at incursion into that 'sphere' would be unavailing"); *Pillon v Attorney General,* 345 Mich 536, 547; 77 NW2d 257 (1956) ("Neither the legislature, nor this Court, has any right to amend or change a provision in the Constitution"). For this reason, to the extent that the plaintiffs argue that the EOA prohibits the Governor from enacting Executive Order No. 1991-31, plaintiffs' argument is completely without merit.[38] If constitutional integrity is to be maintained, the Governor must be allowed to exercise his constitutional authority to reorganize the executive branch free from interference other than a properly supported legislative veto.

v

The Court of Appeals ruled that Executive Order No. 1991-33 could not be implemented because it assumed the implementation of Executive Order No. 1991-31. The Governor did not appeal this ruling, but instead issued Executive Order No. 1992-19, which rescinded the earlier order. The subsequent order is only different from Executive

---

[38] The plaintiffs argue that Executive Order No. 1991-31 is unconstitutional because, in violation of the EOA, the order provides that the director of the new DNR would supervise the transfers and that the Governor would appoint the chairperson of the commission. For the various reasons discussed, this argument must fail because of our conclusions that the Governor is not bound by the EOA and that, even if he was, the EOA could not be interpreted as placing limitations on his constitutional authority to reorganize the executive branch.

Order No. 1991-33 in that it added terms of office for the board members, and the word "new" no longer appears before "DNR." Technically, the rescission of Executive Order No. 1991-33 moots the question of its validity. See *McBroom v City of Flint,* 266 Mich 679, 681; 254 NW 468 (1934). The MEPF persists in its cross appeal, however, and argues that Executive Order No. 1991-33 is unconstitutional and illegal for reasons not addressed by the Court of Appeals, and that these reasons similarly support the invalidation of Executive Order No. 1992-19. Even though this order is not technically before us, the overall issue is, and, in the interest of judicial economy and resolving an important public question, we find that the validity of Executive Order No. 1992-19 should be resolved in this appeal.

For the same reason the Court of Appeals found it invalid, we sustain the validity of Executive Order No. 1992-19. Having decided that Executive Order No. 1991-31 properly creates a "new" DNR, Executive Order No. 1992-19 properly establishes an advisory board designed to advise that department. Whatever the wisdom of allowing such a potentially strong political influence over the DNR and its director is an issue not properly before this Court. Suffice it to say that, not only is Executive Order No. 1991-31 a constitutional expression of the Governor's authority, but, a fortiori, Executive Order No. 1992-19 similarly represents a legitimate exercise of gubernatorial authority.

Even if the board engaged in illegal activity, however, such activity would not affect the validity of the board's creation. See *Harrington v Tate,* 435 Pa 176, 181; 254 A2d 622 (1969).[39] On the contrary,

[39] Moreover, once the validity of a board is established, subsequent improper activities cannot be grounds for the abolition of the board. *Id.*

it should be assumed that an otherwise properly established board will carry out only those functions that were assigned to it. Moreover, contrary to the MEPF's argument, simply because the board may not be subject to the Open Meetings Act or the Freedom of Information Act,[40] this is not a basis for invalidating the board. Whether such executive advisory bodies should be subjected to greater public scrutiny is a matter of legislative, not judicial, concern. For present purposes, the fact that Executive Order No. 1992-19 represents a legitimate expression of the Governor's authority to create advisory bodies for executive branch entities sufficiently compels the conclusion that the Governor has not wrongfully delegated rule-making authority to the Environmental Science Board. As a result, the board is a proper advisory body, and the validity of the order is sustained.

VI

We conclude that the not-for-profit corporate plaintiffs have standing to pursue this lawsuit to prevent the illegal expenditure of state funds. The issues in this case are justiciable political questions and are matters properly before this Court. We also conclude that Executive Order No. 1991-

---

[40] The OMA, which requires meetings to be made public, does not apply to boards empowered by executive order. See MCL 15.262(a); MSA 4.1800(12)(a). On the contrary, the FOIA does apply to boards created through the executive branch. See MCL 15.232(b)(i); MSA 4.1801(2)(b)(i). Simply because the FOIA may apply to the board, however, does not mean that the board must create and maintain records subject to public scrutiny. In other words, "the FOIA does not require that information be recorded; it only gives a right of access to records in existence." *Walloon Lake Water System v Melrose Twp,* 163 Mich App 726, 731; 415 NW2d 292 (1987). See also *Hoffman v Bay City School Dist,* 137 Mich App 333; 357 NW2d 686 (1984) (a public body has no duty to create a record, the FOIA applies only to documents otherwise created).

31 makes the kinds of "changes in the organization of the executive branch" contemplated by art 5, § 2 of the state constitution. Finally, we conclude that Executive Order No. 1992-19 is a properly issued executive order and does not wrongfully delegate rule-making authority to the advisory board created by it.

The decisions of the circuit court and Court of Appeals are reversed and the injunction permanently enjoining the Governor from enforcing Executive Order No. 1991-31 is dissolved.

CAVANAGH, C.J., and LEVIN, BOYLE, RILEY, GRIFFIN, and MALLETT, JJ., concurred with BRICKLEY, J.