**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 25, 2007

TERI ROHDE, BRENDON QUILTER,
MARY QUILTER, WALTER MACKEY,
BARBARA MACKEY, GARY GIBSON,
ELLEN GIBSON, TED JUNGKUNTZ,
LOISE JUNGKUNTZ, DAVID
SPONSELLER, MARY SPONSELLER,
MIKE GLADIEUX, MARTHA
GLADIEUX, HELEN RYSSE, TERRY
TROMBLEY, JOHN WILLIAMS, and
THERESE WILLIAMS,

        Plaintiffs-Appellants

v

No. 128768

ANN ARBOR PUBLIC SCHOOLS a/k/a
PUBLIC SCHOOLS OF THE CITY OF
ANN ARBOR BOARD OF EDUCATION
FOR ANN ARBOR PUBLIC SCHOOLS,
PRESIDENT OF THE BOARD OF
EDUCATION FOR ANN ARBOR PUBLIC
SCHOOLS, and TREASURER OF THE
BOARD OF EDUCATION FOR ANN
ARBOR PUBLIC SCHOOLS,

        Defendants-Appellees.

and

ANN ARBOR EDUCATION
ASSOCIATION, MEA/NEA

Intervening Defendant-
Appellee.
_____

BEFORE THE ENTIRE BENCH

TAYLOR, C.J.

The first issue in this case is whether a letter sent by a resident taxpayer to a public official that "request[s]" the official "investigate and halt" the use of public funds for illegal purposes is adequate to constitute a "demand" pursuant to MCL 129.61 so as to allow the taxpayer, should the public official not act, to undertake a legal challenge to the expenditure of the public funds. We conclude that a letter that conveys a call to act is sufficient to constitute a demand. Having concluded that the plaintiffs' letters did constitute a demand as contemplated by MCL 129.61, we are required to consider whether plaintiffs have constitutional standing to pursue the lawsuit authorized by the statute. We conclude that they do not and hold that MCL 129.61 is unconstitutional to the extent that it confers standing on taxpayers who do not meet the three-part test for determining whether a party has constitutional standing.

Although we disagree with that part of the Court of Appeals opinion that determined that plaintiffs' letters did not constitute a demand under MCL 129.61, on the basis that the plaintiffs lack constitutional standing to sue, we affirm the

2

lower court judgments that held that plaintiffs could not proceed with their lawsuit.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs are Ann Arbor public school district taxpayers who brought suit to challenge the school district's expenditure of public funds to provide health insurance benefits to same-sex domestic partners of school employees. Their complaint alleged that the expenditure of public funds for that purpose violates MCL 551.1, which defines marriage to exclude same-sex unions.[1] Before filing

---

[1] MCL 551.1 provides:

> Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children. A marriage contracted between individuals of the same sex is invalid in this state.

At the same time MCL 551.1 was enacted in 1996, MCL 551.271, which provides for recognition of marriages contracted in other states, was amended to state:

> This section does not apply to a marriage contracted between individuals of the same sex, which marriage is invalid in this state . . . . [MCL 551.271(2).]

Also enacted at the same time was MCL 551.272, which provides:

> This state recognizes marriage as inherently a unique relationship between a man and a woman, as prescribed by [MCL 551.1], and therefore a marriage that is not between a man and a woman is invalid in this state regardless of whether the marriage is contracted according to the laws of another jurisdiction.

(continued…)

3

their lawsuit, several of the plaintiffs sent identical letters to various school board members and other local and state officials, including the county prosecutor, the Attorney General, and the Governor. Each letter stated:

> I [We] write to request that you investigate and halt the use of public funds to provide so-called "domestic partnership" benefits to employees of the Ann Arbor public schools. I [We] believe that the School District's extension of these benefits to its employees exceeds its authority and violates the state law governing marriage. I [We] ask that you halt this illegal use of public funds at your earliest possible convenience.

After the Ann Arbor Education Association, MEA/NEA, intervened as a defendant on behalf of its members, defendants moved for summary disposition pursuant to MCR 2.116(C)(5) (The party asserting the claim lacks the legal capacity to sue.). The trial court granted the motion, determining that plaintiffs failed to bring their suit on behalf of the school district treasurer. The trial court also ruled that plaintiffs' letters failed to comply with the statute in that they did not make a "demand."

---

(…continued)

It is also the case that after this lawsuit was filed, effective December 18, 2004, Const 1963, art 1, § 25 was added by vote of the people to provide:

> To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.

The Court of Appeal recently issued a published opinion holding that art 1, § 25 forbids public employers from offering same-sex health-care benefits. A motion for reconsideration was denied by that Court on March 6, 2007. *Nat'l*

(continued…)

Plaintiffs appealed, and the Court of Appeals affirmed in a published opinion.[2] Although the panel disagreed with the trial court that the plaintiffs had failed to bring suit on behalf of the treasurer, the Court nevertheless affirmed the dismissal of the plaintiffs' lawsuit because it agreed that plaintiffs' requests to the board of education and other governmental officials that they halt the "illegal use of public funds" were insufficient to satisfy the statute's specific-demand requirement.

Plaintiffs filed an application for leave to appeal in this Court. We first ordered oral argument on whether to grant the application or take other peremptory action pursuant MCR 7.302(G)(1), asking the parties to address only the issue of what constitutes an effective demand under MCL 129.61.[3] Thereafter, we granted leave to appeal, asking the parties to brief whether plaintiffs had standing.[4]

## II. STANDARDS OF REVIEW

We review de novo a grant or denial of summary disposition. *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 720; 691 NW2d 1 (2005).

---

(…continued)
*Pride at Work, Inc v Governor,* 274 Mich App 147; 732 NW2d 139 (2007), lv gtd 478 Mich 862 (2007).

[2] *Rohde v Ann Arbor Pub Schools*, 265 Mich App 702; 698 NW2d 402 (2005).

[3] 474 Mich 1120 (2006).

[4] 477 Mich 924 (2006).

Whether plaintiffs' letters constituted a "demand" under MCL 129.61 is a matter of statutory interpretation. We review questions of statutory interpretation de novo. *Miller v Miller*, 474 Mich 27, 30; 707 NW2d 341 (2005).

### III. ANALYSIS OF MCL 129.61

As relevant to the question whether plaintiffs' letters constituted a demand under MCL 129.61,[5] the statute provides, in relevant part, "Before such suit is instituted a demand shall be made on the public officer, board or commission whose duty it may be to maintain such suit followed by a neglect or refusal to take action in relation thereto."

The Court of Appeals noted that the term "demand" is defined in the *Random House Webster's College Dictionary* (1997) as "to ask for with proper

---

[5] The full statute reads as follows:

> Any person or persons, firm or corporation, resident in any township or school district, paying taxes to such political unit, may institute suits or actions at law or in equity on behalf of or for the benefit of the treasurer of such political subdivision, for an accounting and/or the recovery of funds or moneys misappropriated or unlawfully expended by any public officer, board or commission of such political subdivision. Before such suit is instituted a demand shall be made on the public officer, board or commission whose duty it may be to maintain such suit followed by a neglect or refusal to take action in relation thereto. Security for costs shall be filed by the plaintiff or plaintiffs in any such suit or action and all costs and expenses of the same shall be paid by the person or persons instituting the same unless and until a recovery of such funds or moneys be obtained as the result of such proceedings.

authority; claim as a right,"[6] and that the statutory phrase "maintain such suit" indicates that "the purpose of the demand requirement is to inform the appropriate party that legal action is forthcoming." 265 Mich App at 710. It then concluded that plaintiffs' letters did not constitute a "demand" because they were "merely a request that the alleged misappropriation stop; they are not a demand for legal action." *Id.*.

We disagree with the Court of Appeals analysis and conclude that plaintiffs' "request" was sufficient to satisfy the statute's "demand" requirement. Indeed, a request that the Attorney General halt something asserted to be illegal can only be reasonably understood, in the context of a demand to the state's top legal officer, as a demand that he or she take steps to stop such actions up to and including bringing a lawsuit. While plaintiffs did not use the word "demand" in their letters, their "request" is properly considered a "demand." Plaintiffs were not required to use the word "demand."[7] All that is required is a communication that would reasonably be understood as a demand. We agree with plaintiffs that

---

[6] Black's Law Dictionary (8th ed) defines "demand" as "[t]he assertion of a legal or procedural right." This is consistent with the legal definition of a "demand letter," which is: "A letter by which one party explains its legal position in a dispute and requests that the recipient take some action (such as paying money owed), or else risk being sued." *Id.*

[7] See, e.g., *Shallal v Catholic Social Services of Wayne Co*, 455 Mich 604, 616; 566 NW2d 571 (1997) ("A plaintiff should not be required to say "magic words" in order to reap the protections of the [whistleblowers' protection] statute."). Cf. *Burt Twp v Dep't of Natural Resources*, 459 Mich 659, 669; 593

(continued…)

utilization of the more civil, polite term "request" is more likely to secure the desired result of halting an unlawful expenditure than a more provocative "demand."  After all, the apparent object of the statute is to halt unlawful expenditures, not to engender litigation.

We reject defendants' claim that the letters were insufficient because they failed to cite the statute.  MCL 129.61 includes no requirement that the demand refer to the statute.  Defendants also argue that plaintiffs' letters were insufficient to meet the demand requirement because the letters did not request either an accounting or the recovery of the funds expended.  MCL 129.61 provides that a taxpayer may file a lawsuit "for an accounting and/or the recovery of funds or moneys misappropriated or unlawfully expended . . . ."  The statute, however, does not provide that the taxpayer's preliminary demand must specifically be for an accounting or the recovery of funds.

Defendants further argue that plaintiffs' letters were insufficient to meet the demand requirement because they did not contain a sense of urgency, and plaintiffs did not act upon them by filing a lawsuit until almost three years later. But MCL 129.61 does not require that the demand be made with a "sense of urgency."  Plaintiffs requested a halt to the expenditure of public funds "at your earliest possible convenience."  This phrase is a request that action be taken as

(…continued)
NW2d 534 (1999) ("[W]e decline to require that the Legislature use any particular
(continued…)

8

soon as possible. It is sufficient especially because there is no requirement in the statute that the demand convey a sense of urgency.

We also disagree with the Court of Appeals suggestion that MCL 129.61 requires a demand for litigation. The statute provides that before a taxpayer may institute a lawsuit, a demand must be made "on the public officer, board or commission whose duty it may be to maintain such suit" for recovery of unlawfully expended funds. The statute does not expressly require that the demand be for a lawsuit. Further, just because the public body has the ultimate duty to bring a lawsuit if it is needed does not mean that the demand must be for a lawsuit. The taxpayer demand, at a minimum, calls on a conscientious public body to reevaluate whether it is carrying out its duties properly and, in fact, this may result in the public body's acting in compliance with the demand. It may do this by any number of means, only one of which is to enter into litigation. In fact, when the statute uses the phrase "whose duty it *may be* to maintain such suit" (emphasis added), it recognizes this. Moreover, the statute provides that after a demand, before the taxpayer may bring a suit, a precondition is that the public body must neglect or refuse "to take action in relation thereto." This implies that

(…continued)
talismanic words to indicate its intent.").

9

the public body need not necessarily file suit, only that it needs to take some kind of action relating to the matter.[8]

We therefore conclude that the demand made in this matter was sufficient to satisfy MCL 129.61.

## IV. CONSTITUTIONAL STANDING

Having determined that plaintiffs' letters satisfied the requirements of MCL 129.61, we are required to decide whether plaintiffs have constitutional standing to pursue their lawsuit. That is, even though we have determined that plaintiffs are authorized by the Legislature to bring this lawsuit, we must determine whether the independent constitutional requirement of standing presents a separate bar to the lawsuit.

First, as we stated in *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001):

> It is important, initially, to recognize that in Michigan, as in the federal system, standing is of great consequence so that neglect of it would imperil the constitutional architecture whereby

---

[8] We also reject the Court of Appeals dictum that plaintiffs were required to send the demand to the school district treasurer, as "the officer likely responsible for maintaining such a lawsuit." 265 Mich App at 710. There is no indication in the statute that the demand had to be served specifically on the treasurer, as opposed to other key figures in the school district. MCL 129.61 provides that the demand must be made on the "public officer, board or commission" whose duty it may be to maintain the suit. This language makes it clear that demand on a board, rather than one specific member of the board (such as a treasurer), is sufficient. Here, plaintiffs sent letters to all nine members of the school board as well as the superintendent. This was sufficient to give the school district and the treasurer notice of the demand.

10

governmental powers are divided between the three branches of government.

* * *

"[T]he doctrine of standing [is] a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." [*Id.* at 735-736, quoting *Lewis v Casey*, 518 US 343, 349; 116 S Ct 2174; 135 L Ed 2d 606 (1996) (citations omitted).]

In *Lee* we adopted the test the United States Supreme Court uses to determine whether a federal court has standing to hear a lawsuit[9] and concluded:

"[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the

_____

[9] Justice Kelly asserts that we have "ignored" the United States Supreme Court's statement in *Massachusetts v Mellon*, 262 US 447, 486; 43 S Ct 597; 67 L Ed 1078 (1923), that "'[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate.'" *Post* at 10. First, this statement is dictum in light of the fact that the Supreme Court determined that it did not have jurisdiction to hear the challenges raised in *Mellon.* Second, Justice Kelly ignores the fact that, just two sentences later, the Supreme Court noted that "there are decisions to the contrary. See, for example, *Miller v Grandy*, 13 Mich 540, 550 [1865]." *Mellon, supra* at 486. In *Miller*, which has never been overruled, this Court held that "a private tax payer, suffering under no special grievance, is not even a proper party to a bill filed to restrain threatened misconduct . . . ." *Miller, supra* at 550. Therefore, we "ignore" dicta from *Mellon* because, by its own terms, it is inapplicable in determining the scope of the judicial power in Michigan.

11

defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" [*Lee, supra* at 739, quoting *Lujan v Defenders of Wildlife*, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992).][10]

And, as we explained in *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 622-623; 684 NW2d 800 (2004):

> If the Legislature were permitted at its discretion to confer jurisdiction upon this Court unmoored from any genuine case or controversy, this Court would be transformed in character and empowered to decide matters that have historically been within the purview of the Governor and the executive branch. . . . Unless there is an individual who has personally been injured by the Governor's enforcement or administration of these laws, it is not normally the role of the judicial branch to monitor the work of the executive and determine whether it is carrying out its responsibilities in an acceptable fashion. That the Legislature—perhaps even with the acquiescence of the executive—has purported to impose this role upon the judicial branch does not alter this constitutional reality.

---

[10] In *Lujan,* the United States Supreme Court held that the plaintiffs lacked constitutional standing to bring suit under a provision of the Endangered Species Act of 1973 that contained a citizen-suit provision that permitted "any person [to] commence a civil suit on his own behalf—(A) to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this act . . . ." 16 USC 1540(g)(1). The Court in effect held that this provision was unconstitutional as applied to a citizen who lacks constitutional standing.

In *Cleveland Cliffs* we explained that but for a few enumerated exceptions,[11] the definitions of "judicial power" in the United States and Michigan constitutions are identical—both require an "injury in fact" that is both concrete and particularized, as well as actual or imminent, in order to establish standing. *Id*. at 624-629. The Legislature may not confer jurisdiction upon the court "unmoored from any genuine case or controversy . . . ." *Id.* at 622. If the Legislature were to do so, "this Court would be transformed in character and empowered to decide matters that have historically been within the purview of the Governor and the executive branch." *Id.*[12]

---

[11] Const 1963, art 3, § 8 allows either house of the Legislature to request the Supreme Court to issue an advisory opinion on the "constitutionality of legislation"; Const 1963, art 9, § 32 confers upon "[a]ny taxpayer of the state" standing to bring suit to enforce the provisions of the so-called Headlee Amendment; and Const 1963, art 11, § 5 empowers "any citizen of the state" to initiate proceedings for injunctive or mandamus relief to enforce the civil service laws of the state.

[12] See, also, *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286; 715 NW2d 846 (2006), where we discussed the issue of statutorily conferred standing. This Court held that MCL 14.101 and MCL 14.28 did not give the Attorney General standing to intervene to appeal the Court of Appeals judgment, because the Attorney General did not represent an "aggrieved party." In particular, the Court held:

> To the extent one might read MCL 14.101 or MCL 14.28 as allowing the Attorney General to prosecute an appeal from a lower court ruling without the losing party below also appealing, and without the Attorney General himself being or representing an aggrieved party, the statutes would exceed the Legislature's authority because, except where expressly provided, this Court is not constitutionally authorized to hear nonjusticiable controversies. *Nat'l Wildlife Federation, supra* at 614-615. To give these statutes such a reading would contravene an operative presumption of this

(continued…)

We did, however, recognize in *Cleveland Cliffs* that persons bringing qui tam actions[13] were found to have standing by the United States Supreme Court in *Vermont Agency of Natural Resources v United States ex rel Stevens* 529 US 765, 774-777; 120 S C 1858; 146 L Ed 2d 836 (2000). We stated:

> Accordingly, the [*Vermont Agency*] Court held that one who brings a relator suit has standing because he is the assignee of a claim and may assert the injury-in-fact suffered by the assignor, which is normally the government. *Id*. at 773. In such cases, the Court concluded, the government's injury-in-fact suffices to confer standing on the individual relators bringing the suit. *Id*. at 774.
>
> *   *   *
>
> [T]he use of citizen suits or actions by private attorneys general does not undermine the application of traditional standing requirements. If anything, the use of such suits supports the application of those requirements, as citizen suits and actions by private attorneys general have always been grounded in a private injury, whether suffered directly or as a result of an assignment by another. [*Cleveland Cliffs, supra* at 646-647 (emphasis omitted).]

In sum, *Cleveland Cliffs* holds that the Legislature may not confer standing on a party that does not otherwise meet the constitutional injury-in-fact test for standing. But, under *Vermont Agency*, the Legislature may create qui tam actions

(…continued)
Court that we presume constitutional intent on the part of the Legislature. [*Federated, supra* at 294-295.]

[13] "Qui tam" is an abbreviation of a Latin phrase that means "'who pursues this action on our Lord the King's behalf as well as his own.'" *Vermont Agency of Natural Resources v United States ex rel Stevens*, 529 US 765, 769 n 1; 120 S Ct 1858; 146 L Ed 2d 836 (2000) (citation omitted).

14

whereby a statute partially assigns the government's injury in fact claim to a private citizen.

Thus, the question is whether MCL 129.61 creates a qui tam action or an action similar enough to a qui tam action to constitutionally confer standing. In arguing that MCL 129.61 does effectively create a qui tam action, the plaintiffs, drawing on *Vermont Agency*, point out the similarities between the federal False Claims Act at issue in *Vermont Agency*, 31 USC 3729 to 3733, and MCL 129.61. These include, first, that both statutes allow a private citizen to bring a civil action on behalf of the government. Second, both statutes require the private citizen to give the government the opportunity to prosecute the claim on its own behalf, and, finally, that both statutes allow the citizen to go forward with the civil action if the government fails to do so. Yet, while the above similarities exist, the crucial difference between the False Claims Act and MCL 129.60 is that the False Claims Act gives a litigant a concrete private interest in the outcome of the suit, and thus constitutional standing, by providing a bounty.[14] There is no similar provision in MCL 129.61, which has not only no bounty provision but no other mechanism that even conceivably could establish such a private interest.

---

[14] The concept of a bounty is that the plaintiff recovers some of the money judgment if the lawsuit succeeds. For example, the federal False Claims Act awards a relator between 15 and 30 percent of the government's recovery. 31 USC 3730(d)(1)-(2).

15

A second significant distinction between a typical qui tam action (like the one in *Vermont Agency*) and MCL 129.61 is that MCL 129.61 does not have a provision allowing the government to intervene and assume control of the suit. The *Vermont Agency* Court held that a qui tam relator under the federal False Claims Act has standing because he or she is properly considered a partial assignee to assert the injury in fact suffered by the government. This implies that the statute's assignment of claims must be partial rather than full to be valid.[15] Because there is no assignment of any sort in MCL 129.61, this key aspect found in the False Claims Act is also missing.

Moreover, the state, again, unlike the federal government in a situation involving the False Claims Act, is not the real party in interest in a suit brought under MCL 129.61. Our statute does not require the plaintiff to follow procedural safeguards found in the False Claims Act as well as other modern qui tam statutes to ensure that the government remains fully apprised of the litigation, has the opportunity to participate, and retains the power to make key decisions over the relator's objections.[16]

---

[15] See, e.g., Gilles, *Representational standing: US ex rel Stevens and the future of public law litigation*, 89 Cal L R 315, 346 (2001) (It is likely that full assignment of proprietary claims by the government, under a legislative regime that prohibits the executive from intervening or exercising any control over assigned claims, would violate separation of powers.).

[16] For example, the federal False Claims Act, 31 USC 3730 (b) to (f), protects the interest of the United States in the following ways: (1) the relator must serve the complaint and written disclosure of material evidence on the government

(continued…)

For these reasons then, we conclude that MCL 129.61 did not establish a qui tam action that would give plaintiffs constitutional standing to pursue their lawsuit.

Plaintiffs argue in the alternative that even if MCL 129.61 does not establish a qui tam action, they nevertheless must have standing under *House Speaker v Governor*, 443 Mich 560; 506 NW2d 190 (1993), because there the plaintiffs, who had no more of a claim to standing than plaintiffs in this case have, were found to have standing. We disagree. In *House Speaker*, the issue was whether the private nonprofit, corporate plaintiffs had standing to challenge the Governor's authority to transfer the powers of a legislatively created body to a new, gubernatorially created body. The Court, while acknowledging the general principle that standing requires a litigant to "'demonstrat[e] that [its] substantial interest will be detrimentally affected in a manner different from the citizenry at large,'" *id.* at 572 (citation omitted), inexplicably neglected to actually apply that

---

(…continued)

before the complaint is served on the defendant; (2) the relator must file the complaint in camera and the complaint must remain under seal while the government conducts an investigation, and the relator must not serve the defendant except by court order; (3) the government must either intervene and take over the conduct of the action before the defendant is served or notify the court that the relator will be conducting the action; (4) if the government proceeds with the action, it has primary responsibility for prosecuting the lawsuit and is not bound by the acts of the relator; (5) the government may dismiss or settle the action over the objection of the relator; (6) the government must give written consent before the case is dismissed; (7) the government is protected from liability

(continued…)

17

principle. What the Court did do, puzzlingly, was to conclude that because the civic groups met the requirements of MCR 2.201(B)(4),[17] a court rule that in essence gives qualifying persons or groups the right to sue without an injury, they could sue. Yet, as *Lee* and *Cleveland* Cliffs made clear, no court rule or statute can eliminate the injury requirement for constitutional standing. Thus, *House Speaker* is not dispositive and is of limited value because the Court did not address whether the court rule (MCR 2.201) or the corresponding statute (MCL 600.2041) could constitutionally confer standing to an organization that did not have a concrete interest in the suit and did not suffer an injury in fact. To the extent one might read it as having silently done so, we disapprove of it as being inconsistent with *Lee* and *Cleveland Cliffs.*[18]

---

(…continued)
for litigation expenses of the qui tam relator; and (8) the government receives at least 70 percent of any recovery.

[17] This court rule provides:

An action to prevent illegal expenditure of state funds or to test the constitutionality of a statute relating to such an expenditure may be brought:

(a) in the name of a domestic nonprofit corporation organized for civic, protective, or improvement purposes; or

(b) in the names of at least 5 residents of Michigan who own property assessed for direct taxation by the county where they reside.

The statutory counterpart to this court rule is MCL 600.2041(3).

[18] Justice Weaver's partial dissent reiterates her standard response to the recent standing decisions from this Court that were decided by, yes, a majority, as

(continued…)

Plaintiffs admit that their injury is minute and generalized. Thus, it is not a concrete and particularized injury in fact. Indeed, any "remedy" they might obtain will not confer a financial benefit on them.[19] Moreover, any potential benefit plaintiffs might obtain if they prevailed in this lawsuit would not be any different than that which would be obtained by everyone else in the state. Under such circumstances, they do not have constitutional standing.[20]

## V. CONCLUSION

---

(…continued)
they always have been since 1837. See *Lee; Cleveland Cliffs; Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286; 715 NW2d 846 (2006); *Michigan Chiropractic Council v Comm'r of the Office of Financial & Ins Services,* 475 Mich 363; 716 NW2d 561 (2006); and *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc,* 479 Mich ___; ___ NW2d ___ (Docket Nos. 130802, 130803, decided July 25, 2007), and our responses in these cases.

Justice Weaver's position on standing, described by her as "prudential standing," is that there are no immutable rules or standards a litigant must meet to have standing to sue; rather, the court decides as it wishes on a case-by-case basis if a party has standing. The proper understanding of such an approach is as a standing regime with no rules and unlimited power for the judiciary. When no one can know the law in advance, and, of course, no conscientious judge could then operate under it in a principled fashion, no other description suffices. The judicial standing rule we have adopted has no such defect. In short, hers is an essentially arbitrary approach that no amount of accusatory verbiage can camouflage.

[19] MCL 129.61 merely calls for an accounting or a return of funds to the state entity.

[20] See also *Waterford School Dist v State Bd of Ed*, 98 Mich App 658, 662; 296 NW2d 328 (1980), stating that a private citizen has no standing to vindicate a public wrong or enforce a public right where that citizen has not been hurt in any manner different from the citizenry at large, and *Menendez v Detroit*, 337 Mich 476, 482; 60 NW2d 319 (1953), stating that a "private taxpayer, suffering no
(continued…)

19

For all the reasons we have set forth, we conclude that although plaintiffs' demand under MCL 129.61 was sufficient, this statute is unconstitutional to the extent that it purports to confer standing on taxpayers who have not satisfied the *Lee/Cleveland Cliffs* standing requirements.

We reject that part of the Court of Appeals judgment that determined that plaintiffs' letters did not constitute a demand under MCL 129.61, but, on the basis that plaintiffs lack constitutional standing to sue, we affirm the lower court judgments that held that plaintiffs could not proceed with their lawsuit. We remand the case to the trial court for entry of an order dismissing plaintiffs' lawsuit.

Affirmed and remanded to the trial court.

> Clifford W. Taylor
> Maura D. Corrigan
> Robert P. Young, Jr.
> Stephen J. Markman

---

(…continued)
special grievance, is not a proper party plaintiff to a bill of complaint filed to restrain threatened official misconduct."

# STATE OF MICHIGAN

## SUPREME COURT

TERI ROHDE, BRENDON QUILTER,
MARY QUILTER, WALTER MACKEY,
BARBARA MACKEY, GARY GIBSON,
ELLEN GIBSON, TED JUNGKUNTZ,
LOISE JUNGKUNTZ, DAVID
SPONSELLER, MARY SPONSELLER,
MIKE GLADIEUX, MARTHA
GLADIEUX, HELEN RYSSE, TERRY
TROMBLEY, JOHN WILLIAMS, and
THERESE WILLIAMS,

        Plaintiffs-Appellants,

v                                   No. 128768

ANN ARBOR PUBLIC SCHOOLS a/k/a
PUBLIC SCHOOLS OF THE CITY OF
ANN ARBOR BOARD OF EDUCATION
FOR ANN ARBOR PUBLIC SCHOOLS,
PRESIDENT OF THE BOARD OF
EDUCATION FOR ANN ARBOR PUBLIC
SCHOOLS, and TREASURER OF THE
BOARD OF EDUCATION FOR ANN
ARBOR PUBLIC SCHOOLS,

        Defendant-Appellees.
and

ANN ARBOR EDUCATION
ASSOCIATION, MEA/NEA,

        Intervening Defendant-
        Appellee.

---

KELLY, J. (*concurring*).

Plaintiffs brought a suit alleging that defendants violated state law by entering into collective bargaining agreements that define and provide benefits for same-sex domestic partners of school district employees. The circuit court did not reach the substantive issue but dismissed the suit, holding that the plaintiffs did not comply with the requirements of the statute that confers standing to sue, MCL 129.61. The Court of Appeals affirmed that ruling in a published opinion. *Rohde v Ann Arbor Pub Schools,* 265 Mich App 702; 698 NW2d 402 (2005).

A majority of this Court has affirmed the Court of Appeals result on the basis that, although plaintiffs satisfied the statutory demand requirements, they lack constitutional standing to proceed with the suit. I disagree with the majority's standing analysis but agree with the decision to affirm, because I believe that plaintiffs did not satisfy the demand requirements of MCL 129.61.

## FACTS

Plaintiffs are 17 individuals who pay state and local taxes used to fund the Ann Arbor Public Schools (AAPS). Defendants are the AAPS, its board of education, the president of the board, and the treasurer of the board. Intervening defendant is the Ann Arbor Education Association (AAEA), the exclusive collective bargaining representative of the teachers and other school personnel of the AAPS.

In 2000, plaintiffs directed letters to the following public officials: (1) the Governor of the state of Michigan, (2) legal counsel for the Executive Office of

2

the state of Michigan, (3) the Attorney General of the state of Michigan, (4) the Superintendent of Public Instruction in the state of Michigan, (5) the Assistant Superintendent of Public Instruction, (6) the Washtenaw County Prosecutor, (7) nine members of the AAPS board of education, and (8) the superintendent of the AAPS. All the letters read as follows:

> I [or We] write to request that you investigate and halt the use of public funds to provide so-called "domestic partnership" benefits to employees of the Ann Arbor public schools. I [or We] believe that the School District's extension of these benefits to its employees exceeds its authority and violates the state law governing marriage. I [or We] ask that you halt this illegal use of public funds at your earliest convenience.

The letters were sent by certified mail on December 15, 2000, and were received soon after. When no action was taken to halt the expenditure of public funds for benefits to the same-sex domestic partners of AAPS employees, plaintiffs brought suit in the Washtenaw Circuit Court under MCL 129.61. The crux of plaintiffs' claim is that defendants improperly defined and recognized a new form of domestic relations and treated this relationship as the equivalent of marriage in violation of the Michigan defense of marriage act, MCL 555.1.[1]

---

[1] MCL 551.1 provides:

> Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children. A marriage contracted between individuals of the same sex is invalid in this state.

3

The circuit court did not reach the substantive issue, the validity of the domestic partner policy, but dismissed on the ground that plaintiffs did not have standing to sue under MCL 129.61. The court held that (1) plaintiffs had not sued on behalf of or for the benefit of the treasurer of the district as contemplated by the express language of MCL 129.61, and that (2) plaintiffs did not comply with the mandatory requirements of MCL 129.61 that they make a demand before filing suit.

The Court of Appeals affirmed. It disagreed with the circuit court's conclusion that the suit was not filed on behalf of or for the benefit of the AAPS treasurer as required by MCL 129.61. However, the Court did agree that plaintiffs had failed to satisfy the demand requirements of MCL 129.61. The Court stated:

> Pursuant to MCL 129.61, the party must contact the appropriate party ("the public officer, board, or commission whose duty it may be to maintain such suit") and make a demand that a lawsuit be brought by that party for an accounting or recovery of misappropriated funds. Consulting a dictionary to ascribe the term "demand" its plain and ordinary meaning, we find that it provides the definition "to ask for with proper authority; claim as a right." Moreover, the phrase "maintain such suit" indicates that the purpose of the demand requirement is to inform the appropriate party that legal action is forthcoming. Plaintiffs' letters are merely a request that the alleged misappropriation stop; they are not a demand for legal action. Moreover, plaintiffs did not send a letter to the AAPS treasurer, the officer likely responsible for maintaining such a lawsuit. [*Rohde,* 265 Mich App at 709-710 (citations omitted).]

Plaintiffs applied for leave to appeal in the Supreme Court, and we heard oral argument on what constitutes an effective demand under MCL 129.61. 474 Mich 1120 (2006). We then granted leave to appeal, requesting that the parties

4

additionally brief the issue whether plaintiffs have standing under *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004). 477 Mich 924 (2006).

We review de novo a trial court's decision on a motion for summary disposition. *Ostroth v Warren Regency, GP, LLC,* 474 Mich 36, 40; 709 NW2d 589 (2006). This case involves a question of statutory interpretation, which is also reviewed de novo. *People v Tombs*, 472 Mich 446, 451; 697 NW2d 494 (2005).

PLAINTIFFS FAILED TO SATISFY THE *DEMAND* REQUIREMENTS
OF MCL 129.61

The underlying issue in this case is whether the use of public funds for benefits to same-sex partners of public employees is illegal. But the issue before this Court on appeal is whether a request for an investigation and a halting of the use of funds for such benefits constitutes an effective demand under MCL 129.61. The Court of Appeals decided that it did not and, therefore, held that the circuit court had properly granted summary disposition to defendants. I agree with both lower courts' determination that plaintiffs have not satisfied the demand requirements of MCL 129.61.

MCL 129.61 provides:

> Any person or persons, firm or corporation, resident in any township or school district, paying taxes to such political unit, may institute suits or actions at law or in equity on behalf of or for the benefit of the treasurer of such political subdivision, for an accounting and/or the recovery of funds or moneys misappropriated

5

or unlawfully expended by any public officer, board or commission of such political subdivision. Before such suit is instituted a demand shall be made on the public officer, board or commission whose duty it may be to maintain such suit followed by a neglect or refusal to take action in relation thereto. Security for costs shall be filed by the plaintiff or plaintiffs in any such suit or action and all costs and expenses of the same shall be paid by the person or persons instituting the same unless and until a recovery of such funds or moneys be obtained as the result of such proceedings.

The confusion in this case arises because the statute requires "a demand . . . on the public officer, board or commission whose duty it may be to maintain such suit followed by a neglect or refusal to take action in relation thereto" but does not clearly define what action a plaintiff must demand.[2] By reading the statute as a whole and giving effect to every word, phrase, and clause, however, this issue is easily resolved. See *Grimes v Dep't of Transportation,* 475 Mich 72, 89; 715 NW2d 275 (2006).

MCL 129.61 authorizes a taxpayer to bring suit "for an accounting and/or the recovery of funds or moneys misappropriated or unlawfully expended." The statute requires that a demand be made on the party "responsible for maintaining such suit." The dictionary definition of "demand" is "to ask for with proper authority; claim as a right." *Random House Webster's College Dictionary* (2001).

---

[2] The majority opinion finds that "a letter that conveys a call to act is sufficient to constitute a demand" under MCL 129.61. However, it never explains what specific action plaintiffs must request in order to satisfy the demand requirement. Evidently, a call for an investigation and a halting of funds is sufficient, but the majority never explains what language it relies on to reach this conclusion.

(continued…)

It follows that, in order to make an effective demand, a plaintiff must ask the "party responsible for maintaining [the] suit" to undertake the action that the suit would accomplish, which is "an accounting[3] and/or the recovery of funds or moneys misappropriated or unlawfully expended."

In this case, plaintiffs sent letters to the Attorney General, among others, requesting an investigation and a halting of the expenditure of future funds for benefits to same-sex partners of employees. The letters did not request any action with respect to past expenditures; it referred solely to the halting of future expenditures. Even assuming that those who received the letters included the proper party to maintain a suit, the demand requirement was still not satisfied. Plaintiffs never asked anyone, as MCL 129.61 requires, for an accounting of past expenditures or the recovery of funds wrongfully spent.

Requiring plaintiffs to request the specific action that the suit would accomplish is consistent with the purpose of a demand requirement. The phrase "before such suit is instituted" indicates that the Legislature intended that the proper party be given notice and the first opportunity to act. See *Chicago ex rel Konstantelos v Duncan Traffic Equip Co*, 95 Ill 2d 344, 353-354; 447 NE2d 789

---

(…continued)

[3] "Accounting" is defined as "a detailed report of the financial state or transactions of a person, company, etc." *Random House Webster's College Dictionary* (2001).

(1983) (holding that the purpose of a demand requirement in taxpayer lawsuits is to allow the legislative body the first opportunity to decide whether to take the requested action). The letters involved in this case did not request the specific action that would be accomplished by the taxpayer suit. Hence, the proper party was not given the first opportunity to review the matter and decide on its own whether to take this action.

THE STANDING ISSUE

A majority of this Court decides that plaintiffs satisfied the demand requirements of MCL 129.61. But the majority affirms on the basis that plaintiffs do not have standing. Because I would hold that plaintiffs did not satisfy the demand requirements, the standing issue need not be pursued. I am compelled, however, to point out the flaws in the majority's analysis of this issue.

In *Lee v Macomb Co Bd of Commissioners*,[4] this Court expressly adopted the standing test articulated by the United States Supreme Court in *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992).[5] The test has three elements:

---

[4] 464 Mich 726; 629 NW2d 900 (2001).

[5] As I stated in *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004), I disagree with the majority's holding in the case. Where a statute expressly authorizes an action for a violation of the act without the showing of a particularized injury, the Court should not apply the *Lujan* standard. *Cleveland Cliffs*, 471 Mich at 677 (Kelly, J., concurring in result only). I recognize with regret that this Court's decisions in *Lee* and *Cleveland Cliffs* now constitute binding precedent.

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." [*Lee*, 464 Mich at 739, quoting *Lujan*, 504 US at 560-561.]

In federal court, from which test articulated in *Lee* was derived, the general rule is that taxpayers do not have standing to object to a particular expenditure of funds. *DaimlerChrysler Corp v Cuno*, ___ US ___; 126 S Ct 1854; 164 L Ed 2d 589 (2006). "Standing has been rejected in such cases because the alleged injury is not 'concrete and particularized,' but instead a grievance the taxpayer 'suffers in some indefinite way in common with people generally.'" *Id.,* ___ US at ___; 126 S Ct at 1862.

However, exceptions to this general rule exist. The United States Supreme Court has found that the rule that taxpayers do not have standing to challenge a particular expenditure of funds does not apply to municipal taxpayers. In *Massachusetts v Mellon,*[6] the Court held that an individual's status as a federal taxpayer is insufficient to confer standing on that individual to challenge the constitutionality of federal action. *Mellon*, 262 US at 487. But, the Court also held, that "[t]he interest of a taxpayer of a municipality in the application of its

9

moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." *Id.* at 486.

*Mellon* predates by several decades the United States Supreme Court's current three-part test for constitutional standing. Nevertheless, *Mellon* reconciles easily with the current standing inquiry. *Mellon* stands for the proposition that the economic injury of increased taxes suffered by a federal taxpayer is not enough to confer standing. By contrast, the allegedly illegal use of local tax dollars is a sufficiently direct and immediate injury to confer standing on municipal taxpayers.[7] And although the United States Supreme Court has not subsequently specifically addressed the standing issue in connection with a municipal taxpayer, it has reiterated this federal/municipal distinction on several occasions, implicitly ratifying it.[8] E.g., *Cuno*, ___ US at ___; 126 S Ct at 1864-1865; *ASARCO v Kadish*, 490 US 605, 613 109 S Ct 2037, 104 L Ed 2d 696 (1989); *Coleman v Miller*, 307 US 433, 445; 59 S Ct 972; 83 L Ed 2d 1385 (1939).

---

(…continued)

[6] 262 US 447, 487; 43 S Ct 597; 67 L Ed 1078 (1923).

[7] Plaintiffs also could likely show causation and the availability of redress because a favorable decision would result in stopping the flow of the disputed expenditures.

[8] For an extended discussion of federal standing decisions and the different treatment afforded federal, state, and municipal taxpayers see Hickman, *How did we get here anyway*: *Considering the standing question in* DaimlerChrysler v Cuno, 4 Geo J L & Pub Policy 47 (2006).

10

Here, in deciding that plaintiffs, who pay local taxes, do not have constitutional standing to sue, the majority summarily rejects *Mellon* and its progeny. I believe that this is an error. These decisions are persuasive authority and deserve at least to be given serious consideration, if not followed. I am at a loss to explain why the majority previously advocated adopting the federal standing test, yet in this case the same justices summarily dismiss federal caselaw when applying the test.

Contrary to the majority's claims, I recognize that this Court is not bound by the United States Supreme Court's decision in *Mellon*. However, I point out that the majority ignores federal precedent in this case when it has followed in lockstep federal precedent in other recent standing cases. E.g., *Lee*, 464 Mich at 740; *Cleveland Cliffs*, 471 Mich at 628-629; *Michigan Chiropractic Council v Comm'r of the Office of Financial & Ins Services*, 475 Mich 363, 377; 716 NW2d 561 (2006) (opinion by Young, J.) I can see no reason why the majority would follow federal precedent in those cases but summarily dismiss it here.

The majority's assertion that it is simply following this Court's decision in *Miller v Grandy*,[9] raises other questions. To embrace that argument, the reader must accept that the majority has blindly embraced *Miller* as having been correctly decided, even though *Miller* conflicts with federal precedent. At the same time,

---

[9] 13 Mich 540, 550 (1865).

11

the reader must accept that *House Speaker v Governor*,[10] on which plaintiffs rely,

should be overruled because the federal precedent from which *Lee* and *Cleveland*

*Cliffs* are derived is preferable to *House Speaker.* The majority should be

consistent in its use of federal precedent. Or, if not consistent, it should at least

articulate a principled reason for rejecting *Mellon*.[11]

CONCLUSION

The majority affirms the judgment of the Court of Appeals because

plaintiffs do not have standing to sue. I agree with the majority's decision to

affirm, but I do so on separate grounds.

---

[10] 443 Mich 560; 506 NW2d 190 (1993).

[11] The majority claims that the statement in *Massachusetts v Mellon* distinguishing municipal taxpayers from federal taxpayers is dictum. As I explained above, the United States Supreme Court has stated on numerous occasions that *Mellon* established a federal/municipal distinction with respect to taxpayer standing. E.g., *Cuno*, ___ US at ___; 126 S Ct 1864-1865; *ASARCO*, 490 US at 613; *Coleman*, 307 US at 445. The Court does not treat the distinction as dictum. Given that the United States Supreme Court recognizes the distinction as a holding, it would seem that the majority would not characterize it as dictum. Also, the majority's position on this subject is inconsistent. By quoting *Mellon* for the proposition that a plaintiff must suffer a particularized injury, the members of the majority recognized, in *Cleveland Cliffs*, 471 Mich at 615, 616, that the decision on the standing issue in *Mellon* was a holding. The members of the majority do not explain why they have changed their view here. Also, the fact that the United States Supreme Court recently recognized the distinction in *Cuno* illustrates an important point: federal courts today are of a mind that municipal taxpayers generally have standing to challenge an allegedly illegal expenditure of their tax dollars, whereas state and federal taxpayers do not. Considering that this Court's *Lee/Cleveland Cliffs* standing test was derived from federal law, the United States Supreme Court position on standing should be persuasive when this Court applies Michigan's standing test.

12

In order to make an effective demand under MCL 129.61, a plaintiff must ask the party responsible for maintaining the suit for an accounting or the recovery of unlawfully spent funds. Because, in this case, plaintiffs' letters requested only an investigation and the halting of the expenditure of future funds, plaintiffs failed to satisfy the demand requirements of MCL 129.61. Accordingly, the Court of Appeals correctly affirmed the circuit court decision granting summary disposition to defendants.

Marilyn Kelly

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

TERI ROHDE, BRENDON QUILTER,
MARY QUILTER, WALTER MACKEY,
BARBARA MACKEY, GARY GIBSON,
ELLEN GIBSON, TED JUNGKUNTZ,
LOISE JUNGKUNTZ, DAVID
SPONSELLER, MARY SPONSELLER,
MIKE GLADIEUX, MARTHA
GLADIEUX, HELEN RYSSE, TERRY
TROMBLEY, JOHN WILLIAMS, and
THERESE WILLIAMS,

       Plaintiffs-Appellants,

v                                         No. 128768

ANN ARBOR PUBLIC SCHOOLS a/k/a
PUBLIC SCHOOLS OF THE CITY OF
ANN ARBOR, BOARD OF EDUCATION
FOR ANN ARBOR PUBLIC SCHOOLS,
PRESIDENT OF THE BOARD OF
EDUCATION FOR ANN ARBOR PUBLIC
SCHOOLS, and TREASURER OF THE
BOARD OF EDUCATION FOR ANN
ARBOR PUBLIC SCHOOLS,

       Defendants-Appellees.

and

ANN ARBOR EDUCATION
ASSOCIATION, MEA/NEA,

       Intervening Defendant-
       Appellee.

_____

CAVANAGH, J. (*concurring in the result only*).

I concur only with the result reached by the majority because I do not agree with its rationale. Instead, I agree with Justice Kelly that plaintiffs did not meet the statutory demand requirements of MCL 129.61. Accordingly, I believe that the Court of Appeals properly dismissed plaintiffs' case and that there is no need to address the issue of standing.

Michael F. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

TERI ROHDE, BRENDON QUILTER,
MARY QUILTER, WALTER MACKEY,
BARBARA MACKEY, GARY GIBSON,
ELLEN GIBSON, TED JUNGKUNTZ,
LOISE JUNGKUNTZ, DAVID
SPONSELLER, MARY SPONSELLER,
MIKE GLADIEUX, MARTHA
GLADIEUX, HELEN RYSSE, TERRY
TROMBLEY, JOHN WILLIAMS, and
THERESE WILLIAMS,

        Plaintiffs-Appellants,

v                                 No. 128768

ANN ARBOR PUBLIC SCHOOLS a/k/a
PUBLIC SCHOOLS OF THE CITY OF
ANN ARBOR BOARD OF EDUCATION
FOR ANN ARBOR PUBLIC SCHOOLS,
PRESIDENT OF THE BOARD OF
EDUCATION FOR ANN ARBOR PUBLIC
SCHOOLS, and TREASURER OF THE
BOARD OF EDUCATION FOR ANN
ARBOR PUBLIC SCHOOLS,

        Defendants-Appellees.
and

ANN ARBOR EDUCATION
ASSOCIATION, MEA/NEA,

        Intervening Defendant-
        Appellee.

_____

WEAVER, J. (*concurring in part and dissenting in part*).

I dissent from the holding of the majority of four (Chief Justice Taylor and Justices Corrigan, Young, and Markman) that plaintiffs do not have standing to challenge the domestic-partner benefits offered by defendant Ann Arbor Public Schools to its employees.  By basing its decision on faux constitutional principles of standing, the majority of four has further manipulated and eroded Michigan's traditional doctrine of standing.  The majority's holding in this case is an example of the majority of four's misuse of the power of interpretation.  The majority of four overturns long-established law to create new law, not based in our Michigan Constitution.  I would hold that MCL 129.61 grants standing to parties when they meet the requirements set forth in the statute and that, because plaintiffs met the demand requirement of MCL 129.61, plaintiffs have standing to challenge the benefits offered by the Ann Arbor Public Schools.  I would therefore reverse the Court of Appeals judgment holding that plaintiffs failed to meet the demand requirement of MCL 129.61.  However, I would not remand this case to the trial court to decide the substantive issues raised by plaintiffs.  I would instead hold this case in abeyance for *Nat'l Pride at Work, Inc v Governor*, a case in which this Court granted leave to appeal to determine whether public employers may offer benefits to same-sex partners of public employees.[1]

---

[1] *Nat'l Pride at Work, Inc v Governor*, 478 Mich 862 (2007).

2

## I. FACTS

Plaintiffs are individual taxpayers who filed suit under MCL 129.61 to compel defendant Ann Arbor Public Schools (AAPS) to halt the expenditure of public funds defendant used to provide benefits for same-sex domestic partners of school district employees.[2] Plaintiffs alleged that the expenditure of public funds to provide for same-sex domestic-partnership benefits violates MCL 551.1[3] by recognizing same-sex relationships as the equivalent of marriage.

---

[2] MCL 129.61 provides, in pertinent part:

Any person or persons, firm or corporation, resident in any township or school district, paying taxes to such political unit, may institute suits or actions at law or in equity on behalf of or for the benefit of the treasurer of such political subdivision, for an accounting and/or the recovery of funds or moneys misappropriated or unlawfully expended by any public officer, board or commission of such political subdivision. Before such suit is instituted a demand shall be made on the public officer, board or commission whose duty it may be to maintain such suit followed by a neglect or refusal to take action in relation thereto.

[3] MCL 551.1 states:

Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children. A marriage contracted between individuals of the same sex is invalid in this state.

Before filing suit, plaintiffs sent letters by certified mail to various public officials,[4] informing the public officials of the allegedly illegal activity. In the letters, plaintiffs stated:

> I [or We] write to request that you investigate and halt the use of public funds to provide so-called "domestic partnership" benefits to employees of the Ann Arbor public schools. I [or We] believe that the School District's extension of these benefits to its employees exceeds its authority and violates the state law governing marriage. I [or We] ask that you halt this illegal use of public funds at your earliest possible convenience.

When no action was taken by the public officials, plaintiffs filed the instant lawsuit. The trial court dismissed the case on motion for summary disposition, ruling that plaintiffs had failed to meet the requirements to bring a suit outlined in MCL 129.61.[5] On appeal, the Court of Appeals affirmed the trial court, holding that plaintiffs had failed to satisfy the demand requirement of MCL 129.61.[6]

---

[4] Plaintiffs sent letters to the Governor of the state of Michigan, legal counsel for the Executive Office of the state of Michigan, the Attorney General of the state of Michigan, the Superintendent of Public Instruction in the state of Michigan, the Assistant Superintendent of Public Instruction, the Washtenaw County Prosecutor, nine members of the AAPS Board of Education, and the Superintendent of the AAPS.

[5] Thus, the substantive issues of this case have not been argued. However, in *Nat'l Pride at Work, Inc v Governor*, 274 Mich App 147; 732 NW2d 139 (2007), the Court of Appeals held that Const 1963, art 1, § 25, a recent amendment of the Michigan Constitution, forbids public employers from offering same-sex domestic-partnership benefits. We have since granted leave to appeal in *Nat'l Pride at Work*. See 478 Mich 862 (2007).

[6] *Rohde v Ann Arbor Pub Schools*, 265 Mich App 702; 698 NW2d 402 (2005).

Plaintiffs applied for leave to appeal in this Court, and we heard oral argument on whether to grant leave to appeal with respect to the issue of what constitutes an effective demand under MCL 129.61. See 474 Mich 1120 (2006). We then granted leave to appeal. 477 Mich 924 (2006). However, rather than asking the parties to brief only the issues decided in the lower courts, this Court also asked the parties to brief the issue whether MCL 129.61 could grant standing in light of the majority of four's holding in *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co.*[7] *Id.*

## II. THE MAJORITY OF FOUR'S ASSAULT ON STANDING IN MICHIGAN

The majority of four has taken this case, involving the important and controversial issue whether public employers can offer same-sex benefits to public employees, and turned it into a crucial step along its path toward the decimation of the traditional legal doctrine of standing in Michigan.

Beginning with *Lee v Macomb Co Bd of Comm'rs*,[8] a case involving the interpretation of MCL 35.21, the majority overruled Michigan precedent establishing prudential standing as the traditional doctrine of legal standing in

---

[7] *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004).

[8] *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001).

5

Michigan.[9]  In place of Michigan's doctrine of prudential standing, the majority

created for Michigan a constitutional doctrine of standing based on the federal

courts' test for standing, as stated in *Lujan v Defenders of Wildlife*.[10]

---

[9] Before *Lee*, the Michigan standing requirements were based on prudential, rather than constitutional, concerns. See, generally, *House Speaker v State Administrative Bd*, 441 Mich 547, 559 n 20; 495 NW2d 539 (1993), and Justice Riley's concurrence in *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 643; 537 NW2d 436 (1995). The prudential standing test is a long-established test that was used by this Court to provide a standard for litigants to meet in order to have standing to sue. The prudential test requires "a demonstration that the plaintiff's substantial interest will be detrimentally affected in a manner different from the citizenry at large." *House Speaker*, *supra* at 554. The prudential test was never grounded in the Michigan Constitution, because the Michigan Constitution is silent on standing. Thus, standing could, throughout the history of Michigan, be altered by statutes such as MCL 129.61.

[10] *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992). The *Lee* majority, quoting *Lujan*, stated:

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'  Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" [*Lee*, *supra* at 739, quoting *Lujan*, *supra* at 560-561.]

The *Lee* majority adopted the *Lujan* test as a constitutionally based test for standing, under a theory that Const 1963, art 6, § 1, which vests the state courts with "judicial power," granted the Michigan judicial branch only the same limited judicial power bestowed on the federal courts under article III of the United States Constitution.

In *Nat'l Wildlife*, the majority of four, through lengthy dicta, attacked the Michigan Environmental Protection Act (MEPA) as unconstitutional, stating that MEPA granted too much power to the Court through its provision granting standing to any person.[11] Meanwhile, the majority held that the plaintiffs in *Nat'l Wildlife* had standing because they met the federal constitutional standing doctrine adopted by the majority in *Lee*. Thus, despite the lengthy discourse by the

---

[11] The majority concluded that MEPA was granting the judiciary the "executive power" to enforce laws, expanding the judiciary's power beyond the constitutional "judicial power." While the majority feigned judicial restraint, it was in truth engaging in judicial activism. The majority based its analysis on its self-adopted definition of the term "judicial power," a term contained in Const 1963, art 6, § 1. The Michigan Constitution does not define "judicial power," so the majority turned to federal law for a definition; specifically the majority relied on article III of the United States Constitution. But the majority of four's statement in *Michigan Chiropractic Council v Comm'r of the Office of Financial & Ins Services*, 475 Mich 363, 369; 716 NW2d 561 (2006), reveals the United States Constitution's key variation from the Michigan Constitution. The majority stated: "Our tripartite system of government is constitutionally established in both our state and federal constitutions. US Const, art III, § 1 confers upon the courts only 'judicial power'; US Const, art III, § 2 limits the judicial power to '[c]ases' and '[c]ontroversies.'" *Id*. The problem with the majority's comparison between the Michigan Constitution and the federal constitution is that only US Const, art III, § 2 sets out a case-or-controversy limitation. Similar to that contained in the Michigan Constitution, the general idea of judicial power contained in US Const, art III, § 1 is very broad. It is then specifically limited by US Const, art III, § 2. The Michigan Constitution contains no corresponding limitation. Thus, the majority misinterprets what the general federal judicial power entails, and instead defines the power by its own limitations set out in a subsequent section of the federal constitution. To make matters worse, the majority then defines Michigan's judicial power by the federal limitations, even though the Michigan Constitution lacks a similar limitation. The result is the majority's self-created, inferred case-or-controversy standard governing standing in Michigan.

7

majority on the subject, the issue whether the Legislature could grant standing to any citizen, under the test adopted by *Lee*, remained unresolved.

In my *Nat'l Wildlife* concurrence, I stated that by writing such extensive dicta on the subject of citizen-suit standing in a highly publicized case: "The majority can wait for a future case that has not drawn public attention to openly and directly declare the MEPA citizen-suit standing provision unconstitutional."[12]

Although the underlying substantive issue of same-sex benefits in the instant case has stirred up controversy and publicity, the issue has already been decided by the Court of Appeals in *Nat'l Pride at Work*, an appeal that we will review in the coming term. Thus, for all practical purposes, the majority's procedural opinion in this case changes nothing for either side in the debate over same-sex benefits. By deciding that the Legislature cannot grant standing in this case, however, the majority has managed to slip in a major blow to Michigan's traditional doctrine of standing. The majority can now use this holding to declare that statutes such as MEPA unconstitutionally grant standing to citizens, and to avoid the inevitable firestorm that would follow by directly holding so in a case in which the opinion actually has significance to the parties involved. See *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich ___; ___ NW2d ___ (Docket Nos. 130802, 130803, decided July 25, 2007), in

_____

[12] *Nat'l Wildlife*, *supra* at 653-654 (Weaver, J., concurring in the result only).

which the majority indeed applies the holding in this case to declare that MEPA unconstitutionally grants standing to citizens.

Today, the majority not only declares that the Legislature cannot constitutionally grant standing to citizens, it does so by extensively quoting its dicta from *Nat'l Wildlife*. As the majority in *Nat'l Wildlife* admitted, its discussion of the Legislature's ability to grant standing was "simply dicta."[13] The majority's manipulation of dicta to create quotable references designed to affect future holdings is truly indicative of the majority's assault on Michigan's traditional, prudential doctrine of standing. Starting with *Lee*, the majority set the stage to create its standing doctrine, slipping in pieces of dicta along the way in *Nat'l Wildlife*, all so that it could quote itself in future opinions.

The majority has manipulated its own opinions to create its own doctrine of law for standing in Michigan by overruling precedent and by replacing that precedent with a doctrine it characterizes as being based on the Michigan Constitution. By making standing a constitutional concern, the majority has taken the area of legal standing out of the hands of the Legislature and the people and placed it exclusively at this majority's mercy. To make standing a constitutional concern when our Michigan Constitution is completely silent regarding which of the government's branches has power to grant standing represents judicial activism of the most objectionable sort. A power that was once available to all

9

citizens of Michigan, the power to bring a lawsuit, can now only be reclaimed by constitutional amendment. The majority has created its own definition of "judicial power," based on the case-or-controversy *limitations of the judicial power* specifically enumerated by the United States Constitution for the federal courts,[14] and adopted it as some type of inherent quality of the Michigan Constitution.

The majority interjects the term "case-or-controversy" into the Michigan Constitution in order to conclude that MCL 129.61 is unconstitutional. By interjecting the term "case or controversy" into the Michigan Constitution, the majority obscures the plain language of the most important document in Michigan's legal system. Further, the majority holds a statute unconstitutional when, as this Court has long recognized, this Court must presume that the Legislature would not violate the constitution.[15] The majority is adopting a term it infers from the Michigan Constitution and using that inference as a means to defeat the presumption of constitutionality inherent in all Michigan legislation.

As the majority points out, *ante* at 17-18, before the decision in *Lee*, this Court did not address standing as a constitutionally based test.[16] The majority

---

(…continued)

[13] *Nat'l Wildlife*, *supra* at 649 n 33.

[14] See n 11 of this opinion.

[15] *People v McQuillan,* 392 Mich 511, 536; 221 NW2d 569 (1974).

[16] As I wrote in my concurrence in *Lee*:

(continued…)

10

correctly states that in *House Speaker v Governor*, this Court concluded "that because the civic groups met the requirements of MCR 2.201(B)(4),[17] a court rule that in essence gives qualifying persons or groups the right to sue without an injury, they could sue." *Ante* at 17-18. While the majority may find it "inexplicabl[e]" or "puzzling[ ]" that this Court in *House Speaker* would use such

---

(…continued)

In *House Speaker* we stated that "this Court is not bound to follow federal cases regarding standing," pointing out that "[o]ne notable distinction between federal and state standing analysis is the power of this Court to issue advisory opinions. Const 1963, art 3, § 8. Under Article III of the federal constitution, federal courts may issue opinions only where there is an actual case or controversy." [*House Speaker*, *supra* at] 559, including n 20. Justice Kennedy, writing for the Court in *ASARCO Inc v Kadish*, 490 US 605, 617; 109 S Ct 2037; 104 L Ed 2d 696 (1989), acknowledged:

"We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability . . . ." [*Lee*, *supra* at 743 n 2.]

[17] MCR 2.201(B)(4) provides:

An action to prevent illegal expenditure of state funds or to test the constitutionality of a statute relating to such an expenditure may be brought:

(a) in the name of a domestic nonprofit corporation organized for civic, protective, or improvement purposes; or

(b) in the names of at least 5 residents of Michigan who own property assessed for direct taxation by the county where they reside.

The statutory counterpart to this court rule is MCL 600.2041(3).

an analysis to give citizens standing,[18] it is a puzzle that does not require much thought to solve and explain. This Court applied MCR 2.201(B)(4) in *House Speaker* because, at that time, Michigan followed a prudential standing test, rather than a constitutionally based standing test created by the majority of four. Court rules and statutes could, at that time, be used to grant standing even when the plaintiffs did not suffer a concrete injury to themselves or their representatives.[19] The majority in *Lee* overruled the traditional prudential standing doctrine and instead creatively adopted for Michigan the federal constitutional standing test, despite no relevant change in the Michigan Constitution or applicable Michigan codified law.

In fact, in *Miller v Grandy*,[20] an 1865 case cited by the majority for the proposition that taxpayers in Michigan do not have standing to sue, this Court applied the traditional prudential standing test. Until *Lee*, this Court analyzed standing without resorting to the Michigan Constitution, even though the Michigan Constitution has always included reference to the courts' "judicial power" that the majority now cites as support for its creative conclusion that an

---

[18] *Ante* at 17.

[19] Under *House Speaker*, plaintiffs in this case would have standing to sue because they have complied with MCL 129.61. As discussed in part III of this opinion, plaintiffs can bring a suit or action at law under MCL 129.61 on behalf of a political subdivision for the recovery of misappropriated funds.

[20] *Miller v Grandy*, 13 Mich 540 (1865).

implied constitutional power to determine standing belongs only to the judicial branch.[21]

The most important difference between pre-*Lee* and post-*Lee* standing doctrine is that, post-*Lee*, standing is now a constitutional concern. Regardless of what standing test was used before *Lee* was decided, standing was never grounded in the Michigan Constitution. The Legislature could always confer standing on citizens without concern for violating the separation of powers doctrine.

For the reasons stated, I cannot agree with the majority that MCL 129.61 unconstitutionally grants standing to citizens, because I cannot agree that standing is rooted in the Michigan Constitution. The majority has gone too far in creating its own standing test as a constitutional test. It has taken away a valuable power from the Legislature and the people of Michigan. I believe that, even when a plaintiff does not meet the three-part test adopted by the majority in *Lee*, the Legislature is not barred by the Michigan Constitution from granting standing to that plaintiff.

### III. PLAINTIFFS SATISFIED MCL 129.61

While I dissent from the majority's holding that plaintiffs lack constitutional standing, I agree with and concur in the majority's analysis of the plaintiffs' compliance with the requirements outlined in MCL 129.61, contained in

---

[21] See, e.g., Const 1835, art 6, § 1; Const 1850, art 6, § 1; Const 1908, art 7, § 1.

part III of the majority opinion, in which the majority holds that plaintiffs satisfied the demand requirement of MCL 129.61.

## IV. CONCLUSION

I would hold that MCL 129.61 grants standing to parties when they meet the requirements set forth in the statute and that, because plaintiffs met the demand requirement of MCL 129.61, plaintiffs have standing to challenge the benefits offered by defendant Ann Arbor Public Schools.

I would reverse the Court of Appeals judgment that plaintiffs failed to meet the demand requirement of MCL 129.61. I would not remand this case to the trial court to decide the substantive issues raised by plaintiffs. I would instead hold this case in abeyance for *Nat'l Pride at Work*, a case in which this Court will determine whether public employers may offer benefits to same-sex partners of public employees.

The holding by the majority in this case is a victory for neither side in the contentious debate over the constitutionality of same-sex benefits for public employees. Rather, it is a defeat for all the people of Michigan, who now have to contend with the majority's unrestrained decision that the Legislature cannot grant legal standing to the citizens of this state.

Elizabeth A. Weaver

14